**IN THE MATTER OF ARBITRATION** )
                                           )
    Between: )
                                           )
**POLICE BENEVOLENT & PROTECTIVE** )
**ASSOCIATION OF ILLINOIS, LOCAL 185,** )    FMCS Case No. 240716-08140
                                           )
            Union, )    Mustafa Jallow Termination
                                           )
    and )
                                           )
**UNIVERSITY OF CHICAGO,** )
                                           )
           Employer. )

## OPINION AND AWARD

**APPEARANCES:**

On Behalf of the Union:                    Charles R. Crowley, Esq.
                                             Policemen's Benevolent Labor Committee
                                           840 South Spring Street
                                           Springfield, IL 62704

On Behalf of the Employer:              James J. Powers, Esq.
                                             Clark Baird Smith LLP
                                           6133 North River Road
                                           Suite 1120
                                           Rosemont, Illinois 60018

**ARBITRATOR:**                          Jules I. Crystal



## I. STATEMENT OF THE ISSUES

The parties did not stipulate to the issue. I find the issue to be as follows:

Did the Employer have just cause to discharge the Grievant? If not, what shall the remedy be?

## II. RELEVANT CONTRACT PROVISIONS, RULES & POLICIES

### A. COLLECTIVE BARGAINING AGREEMENT

\* \* \*

### ARTICLE 4    MANAGEMENT'S RIGHTS

SECTION 4.1    ENUMERATION.

[…] Specifically, but without limiting or affecting the generality of the above statements, it is distinctly understood and agreed that this Agreement does not affect and shall not be deemed or construed to impair or limit in any way the Employer's right in its sole discretion and judgment, . . . to hire, promote, demote, and transfer, to suspend, discipline and discharge for cause; and discontinue temporarily or permanently, in whole or in part, any operations of the University covered or affected by this Agreement.

The Employer will also have the right from time to time to make and enforce any reasonable rules applicable to Officers covered by this Agreement, as it may from time to time deem necessary or advisable. Additionally, the Employer may set reasonable appearance and dress standards.

The parties recognize that any management responsibility, prerogative or rights not specifically and clearly limited by the terms of this Agreement are reserved to the management of the University.

\* \* \*

### ARTICLE 12    GRIEVANCE PROCEDURE

\* \* \*

SECTION 12.3    GRIEVANCE PROCEDURE Grievances will be handled in the following manner:

\* \* \*

C.    Step 3: Arbitration. . . .

\* \* \*

3.    The arbitrator's decision will be final and binding on the University, the Union and the aggrieved Officer(s). The arbitrator may consider and decide only the particular grievance presented and their decision shall be based only on an

2

application or interpretation of the provisions of this Agreement. The arbitrator will have no authority to alter, modify, amend, add to or subtract from the provisions of this Agreement.

4.  The fee and expenses of the arbitrator shall be divided equally between the parties. The parties will bear their own expenses in preparing for and presenting their positions to the arbitrator.

5.  In no event shall an award be retroactive beyond thirty (30) calendar days prior to the date the grievance was first presented in writing.

6.

* * *

SECTION 12.4. DISCIPLINARY GRIEVANCES.

A.  Any disciplinary action against any Officer will be subject to the grievance procedure, including arbitration. Officers suspended or discharged must demand a hearing within three (3) working days after the notice of discharge or suspension, or the grievance shall be deemed abandoned. The grievance will be initiated at Step 2 of the grievance procedure.

B.  If back pay is ordered, interim earnings will be set off against the total amount of back pay due.

Interim earnings will include unemployment compensation benefits and any other monies received during the period covered by the claim; provided, however, those earnings that would have been received, had active employment at the University been continuous, will not be allowed as a set-off against any back pay ordered. In the case of a discharge, the Officer has the duty to mitigate the amount of their back pay.

**B.  UNIVERSITY OF CHICAGO POLICE DEPARTMENT GENERAL ORDERS**

* * *

**G[ENERAL] O[RDER] 108**

**108.3 POLICY**

A.  It is the policy, and a guiding principle, of the Department to value and preserve human life. Employees will afford all, the respect and dignity to which all people are entitled. The use of excessive or unwarranted force or unprofessional conduct by an employee will not be tolerated.

B.  Employees will only use reasonable force based on the totality of the circumstances to perform a lawful task, effect an arrest, overcome resistance, control a subject, or protect themselves or others from injury.

C.  As set forth by the United States Supreme Court in Graham v. Connor, 490 U.S. 386 (1989), the central inquiry in every use of force is whether the amount of force used by the officer was objectively reasonable in light of the circumstances faced by the officer.

1.     Factors which determine the reasonableness of a use of force include:

    a.     The severity of the crime at issue,

    b.     Whether the subject poses an immediate threat to the safety of officers or others,

    c.     Whether the subject is actively resisting arrest or attempting to evade arrest by flight.

2.     The reasonableness of a use of force will be judged under the totality of the circumstances viewed from the perspective of a reasonable officer on the scene.

D.     **Officers shall use de-escalation techniques whenever appropriate and practicable, to attempt to avoid the use of force, or minimize the level of force required.**

E.     Whenever practicable and **when such delay will not compromise the safety of the officer or another, and will not result in the destruction of evidence, escape, or commission of a crime**, an officer will allow a person time and opportunity to submit to verbal commands before force is used.

\* \* \*

**108.4 USE OF LESS-LETHAL FORCE**

Before taking police action, officers will identify themselves as police officers unless identification would jeopardize the safety of the officer or others or compromise the integrity of an investigation. Officers may, at their discretion, choose to use lesser force options than those outlined below. However, there is no requirement to consider or utilize lesser force options.

A.     <u>Passive Resister</u>: a person who fails to comply (non-movement) with verbal or other direction. The following options are appropriate when dealing with a passive resister:

1.     Holding Techniques

    Holding consists of techniques applied to the limbs, such as wristlocks, and come-along holds (i.e., escort holds that are **not** pain compliance techniques).

\* \* \*

B.     <u>Active Resister</u>: a person whose actions attempt to create distance between them and an officer's reach. This type of resistance may include evasive movement of the arm, flailing arms, and/or full flight by running. The following response options are appropriate when dealing with an active resister:

4

      1.     Stunning is diffused-pressure striking or slapping and is an attempt to increase control by disorienting the subject and interfering with the subject's ability to resist.

      2.     Oleoresin Capsicum (OC) Spray is an appropriate force option against all active resisters without the need for supervisory authorization.

C.     <u>Assailant</u>: a subject whose actions are aggressively offensive with or without weapons. This type of assailant is one who places a person in reasonable apprehension of receiving a battery. Assailants whose actions will likely cause death or great bodily harm to another are not included here (see section 6, Deadly Force). [1]

* * *

## 108.7 INCIDENTS REQUIRING TACTICAL RESPONSE REPORT

A.     The Tactical Response Report (UCPD-44.179) will be used to document the following incidents:

      1.     Any action by an employee that results in , or is alleged to have resulted in, injury or death of another person.

      2.     Any employee who discharges a firearm for other than training, or recreational purposes (e.g. hunting, competitive shooting, historical reenactments, etc.).

      3.     Any employee who discharges a Taser for other than training purposes.

      4.     Any non-training application of force by an employee using any less lethal weapon.

      5.     All forms of physical force applied by an employee, beyond that normally used to effect an arrest, protective custody or detention. This includes, bu is not limited to:

           a.     Response to active physical resistance by the subject

           b.     Situations where it is necessary to repeatedly physically restrain a subject (beyond guiding actions).

B.     This order does not require reporting the display or pointing of weapons.

C.     If the most serious use of force requires an investigation by the Office of Professional Accountability (OPA), then the findings of all Tactical Response Reports from the use of force by any employee in that instance will be the responsibility of OPA.

## 108.8 PROCEDURES FOR TACTICTAL RESPONSE REPORT

---

[1]     Jt. Exh. No. 5, Bates Nos. 142-46.

A.    Each employee who is involved in an incident listed in Section 108.7.A will:

    1.    Immediately make notifications to the UCPD ECC and the on-duty Shift Supervisor and record the name of the person receiving the notification in the case report for all incidents involving the discharge of a firearm.

    2.    Complete a Tactical Response Report (UCPD-44.179), unless the incident was an incident involving deadly force covered by General Order 110.6.

* * *

    3.    Ensure that their completed Tactical Response Report packet is submitted along with other required police reports to the on-duty Shift Supervisor before the end of their tour of duty.

B.    The Shift Supervisor who has been notified of an incident listed in 108.7.A will:

    1.    Respond to the scene, if practical.

* * *

    6.    Complete the Tactical Response Report for an employee who cannot complete the report due to injury.[2]

* * *

### G[ENERAL] O[RDER] 529

**529.1 PURPOSE**

The purpose of this order is to establish policy and guidelines for the operation and use of officer-worn body cameras.

* * *

**529.5 WHEN CAMERAS MUST BE TURNED ON (RECORDING)**

Cameras must be turned on (recording) at all times when the officer is in uniform and is responding to calls for service or engaged in any law enforcement-related encounter or activity, that occurs with the officer is on-duty.[3]

* * *

### G[ENERAL] O[RDER] 1002

---

[2]    Jt. Exh. No. 5, Bates Nos. 149-51.

[3]    Er. Exh. No. 2, pp. 1, 2.

\* \* \*

**1002.4 DEPARTMENT ETHICS**

In support of the ethics listed in the preceding paragraphs, employees of the University of Chicago Police Department must conform to the following principles:

A.      The will tell the truth, the whole truth, and nothing but the truth.  Any resort to half-truths or evasions will result in irreparable damage to their reputation, and destroy public confidence and official confidence in the entire department.[4]

\* \* \*

### G[ENERAL] O[RDER] 1003

**1003.1 PURPOSE**

The purpose of this order is to establish the responsibility of employees to conduct themselves in a manner which exemplifies the highest level of professionalism.

**1003.2 POLICY**

It is the policy of the University of Chicago Police Department that employees, on and off duty, shall conduct themselves in a manner above reproach , contributing to public trust, fulfilling their duties, and building a positive reputation for the Department.

**1003.3 GOALS OF THE DEPARTMENT**

A.      Protection of life, limb, and property in the UCPD jurisdiction.

B.      Prevention of crime.

C.      Preservation of the public peace.

D.      Enforcement of laws.

E.      Charging of law violators, and assembling competent evidence of the violation.

F.      Promote respect and cooperation of all persons for the law and those sworn to enforce it.

\* \* \*

---

[4]      Jt. Exh. No. 5, Bates Nos. 167, 168.

**1003.5 DUTIES OF EMPLOYEES**

\* \* \*

B.  Sworn personnel will devote themselves to attaining Department goals (Section 3). They will conduct themselves in such a manner as will reflect credit upon the Department, with emphasis on integrity and professionalism. They will:

1.  Render the highest order of police service to all persons.

\* \* \*

3.  Know and follow the Department's Policies, Rules Regulations, Orders, and Procedures.[5]

\* \* \*

## III. <u>STATEMENT OF THE CASE</u>

The University of Chicago (hereinafter "Employer") and the Police Benevolent & Protective Association of Illinois, Local 185 (hereinafter "Union") are parties to a collective bargaining agreement effective from May 1, 2023, to April 30, 2027. In this collective bargaining agreement (hereinafter "Agreement" or "Contract"), the Employer recognizes the Union as the

exclusive agent for purposes of collective bargaining with respect to wages, hours and conditions of employment for all certified and non-certified Police Officers at the rank of PO3 and PO2 who are:

1.  full-time Police Officers or except as provided in §2.1D., below;
2.  "eligible" part-time Police Officers as defined in §2.2A., and
3.  employed by the University at its campus located at and around 5801 South Ellis Avenue, Chicago, Illinois 60637[6]

The instant arbitration results from a grievance filed by Mustapha Jallow (hereinafter "Grievant" or "Jallow") on April 12, 2024. The grievance challenged Jallow's termination as without just cause. The Employer argues that the termination is supported by just cause. As a

---

[5]     Jt. Exh. No. 5, Bates Nos. 157, 158.

[6]     Jt. Exh. No. 1, pp. 7-8.

8

result of the parties' respective positions, an arbitration hearing was conducted before the undersigned on December 9 and December 30, 2024.[7] The parties were afforded the opportunity to present their evidence, including the examination and cross-examination of witnesses. Subsequent to the hearing, the parties filed post-hearing briefs on March 26, 2025, whereupon the record was closed.

## IV. SUMMARY OF RELEVANT EVIDENCE

### A.     Background on the Employer and Grievant

The Employer is a private university located on the south side of Chicago with approximately 17,000 students and about 10,000 employees.[8] The Employer operates a campus police department, which is authorized by the Illinois Private College Campus Police Act.[9] The police department has "full law enforcement authority within its jurisdiction as defined by state law."[10] In addition, the City of Chicago has granted the department law enforcement authority extending four square miles outside the campus.[11] The Employer's police department is the primary law enforcement agency on the campus and adjoining streets, while the City of Chicago's police department is the primary law enforcement agency outside the immediate campus.[12] In the area outside the campus, the Employer's police department plays a supporting role and can take reports, as well as responding to emergencies.[13] At the time of the hearing,

---

[7]      The first day of hearing was conducted at the University of Chicago, while the second day of hearing was held via zoom. Tr. 1, 255.

[8]      Tr. 143.

[9]      *Id.* 110 ILCS 1020/0.01, 1020/1.

[10]      Tr. 144.

[11]      *Id.*; Er. Exh. No. 1.

[12]      Tr. 158-59.

[13]      *Id.*

there were 120 sworn police officers employed by the Employer, 92 of which were patrol officers.[14]

The Employer operates a hospital, which is located in what has been described as a high crime area of Chicago.[15] The hospital operates one of the few trauma centers on the south side of Chicago.[16] One of the assigned beats for patrol officers is the hospital emergency room, where many trauma victims are treated.[17]

Grievant was hired as a patrol officer in June 2021.[18] He was previously employed as a case manager working with individuals who were homeless or had substance abuse issues, in addition to being a substitute teacher and special education classroom assistant.[19] He also served six years in the Army National Guard.[20] After completing his training at the Chicago Police Academy in 2021, Grievant was assigned to C-squad which operates on the night shift.[21] Grievant received two commendations while working for the Employer. The first, awarded during his probationary training period, was for his responsiveness and attention to duty during an incident arising from a traffic accident and subsequent foot pursuit of an offender who threw a gun over a fence during the pursuit.[22] Grievant observed the man disposing of the gun, alerted

---

[14]     Tr. 146.

[15]     Tr. 104, 177.

[16]     *Id.*

[17]     Tr. 104, 172.

[18]     Tr. 169.

[19]     *Id.*

[20]     Tr. 169-71; Union Exh. No. 1.

[21]     Tr. 172.

[22]     Tr. 173-74; Union Exh. No. 2.

other officers to that fact and the location, and the officers were able to retrieve the gun.[23] The second commendation was for apprehending an armed robbery suspect that was fleeing after being stopped by other officers.[24] Grievant was forced to draw his gun to apprehend the suspect, who was armed.[25]

### B.     The November 20, 2022, Incident[26]

On November 20, 2022, Grievant was assigned to work in the hospital emergency room (hereinafter "ER").[27] Both security officers and police officers are assigned to work in the ER.[28]

#### 1. Testimony of Grievant[29]

Grievant was working with Security Officer Roberson, who was at the check-in desk.[30] At about 2:16 a.m., a man wearing a jacket and mask entered the ER and attempted to bypass the security desk and walk into the restricted area.[31] Neither Officer Roberson nor Grievant had seen the visitor before, although Grievant had been working all night.[32] When Officer Roberson informed the visitor that he needed to show his identification to enter the ER, the visitor quickly

---

[23]     Tr. 174.

[24]     Tr. 175-76; Union Exh. No. 3.

[25]     Tr. 176.

[26]     All dates herein refer to 2022 unless otherwise specified.

[27]     Tr. 177-78.

[28]     Tr. 177.

[29]     Grievant's testimony walked through the video footage from his body-worn camera and also from the hospital security camera footage. Jt. Exh. Nos. 3, 4.

[30]     Tr. 178.

[31]     Tr. 178, 187. The man in question, whose identity was not disclosed, will be referred to herein as the visitor.

[32]     Tr. 187. Roberson had just started his shift. *Id*

11

showed a document to Grievant and asked to be let into the ER.[33]  Grievant informed the visitor that he had to show his identification to the security officer.[34]  When the visitor showed the document to Officer Roberson, Officer Roberson explained that his pass had expired and he needed to renew it using the government-issued identification that he utilized to obtain the pass.[35]  The visitor began to shout and curse at Officer Robinson, telling him that his pass had not expired.[36]  The visitor then walked away and sat in a row of seats reserved for patients.[37]  When the hospital staff told the visitor that he could not sit there, the visitor proceeded to argue with them.[38]  Officer Roberson also called out to the visitor from the security desk, telling him that he could not sit in that location and that he needed to return to the desk and resolve the issue with his identification.[39]

Grievant approached the visitor and asked him to show his identification to the security officer,  indicating to the visitor that he had shown his identification to get in originally and should be able to show it again to update his pass.[40]  The visitor got up and went back to the desk but began to argue with the officer again.[41]  The visitor then walked away from the desk and was slowly moving toward the doors that opened into the ER.[42]

---

[33]     Tr. 178, 187.

[34]     *Id.*

[35]     Tr. 178-79.

[36]     Tr. 179, 190.

[37]     Tr. 179, 189.

[38]     Tr. 179

[39]     *Id.*

[40]     Tr. 180.

[41]     *Id.*

[42]     *Id.*

Grievant was concerned about the visitor's behavior.[43] The visitor had failed to provide his name or the name of the person he was visiting.[44] Since some visitors throw their passes in the trash when the pass is no longer needed, Grievant worried that the visitor might have simply taken the pass from the trash without providing any identification.[45] In addition to the foregoing concerning behavior, the visitor periodically edged toward the Emergency Room door when it opened.[46] Officer Roberson also observed the visitor's behavior regarding the door and told him that he could not go back to the ER area.[47] Several staff members came out of the ER to get another patient and the visitor spoke to them, pointing back into the ER area.[48] The visitor said the person he wanted to visit was in the ER treatment area and he wanted to go back to see the patient.[49] When the staff members told the visitor that he needed to speak with security, he began to curse at the staff.[50] Grievant turned on his body camera at that time.[51] Roberson again told the visitor that he had to show his identification, after which Roberson threw the visitor's

---

[43]    Tr. 181.

[44]    Tr. 181, 218-19.

[45]    *Id.*

[46]    *Id.*

[47]    *Id.*

[48]    *Id.*

[49]    Tr. 195-96.

[50]    Tr. 181, 196.

[51]    Tr. 266.

pass in the trash can by the desk.[52]  After Roberson told the visitor that he had to leave the ER,[53] the visitor retrieved his pass from the trash.[54]

Roberson then walked toward the treatment area to look for the patient in a wheelchair that the visitor had said he came to pick up.[55] As Roberson headed into the ER, he told the visitor again that the visitor had to leave, stating "let's go,"[56] and that he was not going to be allowed in the ER treatment area.[57]  Grievant followed up this directive by saying to the visitor, "Come on man, he asked you to leave."[58]  At this point Grievant assumed that the security officer was "about to leave" and that the visitor would be leaving with him.[59]  Grievant asked the visitor twice whether he was going to leave of his own volition, to which the visitor responded that he was not going to leave.[60]  Grievant spoke to the visitor with his palms up as he has learned from experience that doing so has a disarming effect.[61]  Grievant called dispatch on his radio indicating that there was a disturbance in the ER as he was not sure what was going to happen with the visitor, after which Grievant started to escort the visitor from the ER, stating "[c]ome on, let's go."[62]

---

[52]     Tr. 182, 217.

[53]     Tr. 217.

[54]     Tr. 182, 197.

[55]     Tr. 182-83, 218; Jt. Exh. No. 3.  It is not clear whether Roberson was referring to telling the staff or the patient that the visitor could not come back.

[56]     Jt. Exh. No. 3.

[57]     Tr. 183, 218.

[58]     Jt. Exh. No. 3.

[59]     *Id*.

[60]     Tr. 183, 219; Jt. Exh. No. 3.

[61]     Tr. 201; Jt. Exh. No. 3.

[62]     Tr. 183, 202, 220; Jt. Exh. No. 3.

14

Based on the statement of the security officer, Grievant concluded that the visitor was trespassing,[63] but he did not tell the visitor that he could be arrested if he did not exit the emergency room voluntarily.[64] Although Grievant had not yet received an official complaint of trespass, Grievant felt certain, based on prior experience, that Officer Roberson would sign a complaint after the fact if necessary.[65] Also, it was not uncommon for security officers to request removal of an individual from the ER, and thereafter sign a complaint refusal form.[66] Grievant could have arrested the visitor for trespass when he refused to leave, but he decided not to do so.[67] Instead, Grievant escorted the visitor out of the building.[68] "[T]he threat wasn't about committing violent harm to [Grievant] or necessarily anybody," but about the results if the Grievant "goes back there [into the ER] and starts messing with oxygen tanks, which were near the door."[69] As Grievant testified, "[W]hat if this man just out of nowhere pulled out a lighter and did that [indicating a flick of the lighter] ... to the oxygen tank."[70]

Had the visitor simply left after being escorted out, Grievant would have asked Roberson if he wanted to complete a "complaint refusal form."[71] If, instead, Roberson wanted to proceed with a trespass complaint, the complaint would have listed either an unknown trespasser or, if

---

[63]     Tr. 203.

[64]     Tr. 265.

[65]     *Id.*

[66]     Tr. 280-81.

[67]     Tr. 269-70.

[68]     Tr. 270.

[69]     Tr. 267-68.

[70]     *Id.*

[71]     Tr. 275, 278.

15

Grievant was able to obtain information about the trespasser from the computer, a name would be placed on the police report and an effort made to find and arrest the trespasser.[72]

When asked whether he had observed similar incidents at the hospital, Grievant testified about an incident that occurred after his return to work from the injury and military leave that followed the November 20th incident.[73] In that incident, an officer handcuffed a woman who refused to leave the hospital, but when she then agreed to leave, the officer took off the handcuff an physically guided her out.[74] Grievant did not know if the officers present had asked the staff whether or not they wanted to press trespassing charges against the woman prior to placing her in handcuffs.[75] Grievant completed a complaint refusal form and "put in notes" regarding the event after discussion with the field training officer, as he was concerned about not doing so based on his prior experience.

To remove a visitor from the hospital, Grievant placed his hands on the visitor's shoulders to escort him out – an "escort hold" that does not utilize "pain compliance." According to Grievant, this form of escort was appropriate for a "passive resistor."[76] The visitor walked toward the door with one hand on his phone and the other in his pocket.[77] The visitor then began to resist the escort, pushing back into Grievant.[78] Grievant pushed harder to continue the effort

---

[72]     Tr. 279-80.

[73]     Tr. 319. Grievant also testified that he has seen officers "physically remove individuals" using "a level 1 of force" without making an arrest. Tr. 318-19.

[74]     *Id.*

[75]     Tr. 204.

[76]     Tr. 220.

[77]     Tr. 204, 220.

[78]     Tr. 184, 205.

to usher the visitor outside, having determined that the visitor was now an "active resistor."[79] field training officer whether they needed to make an arrest or complete a "to/from" form, to which the officer answered that it was not necessary in that this regularly.[80]

　　To remove the visitor from the hospital, Grievant placed his hands on the visitor's shoulders to escort him out, using an "escort hold that doesn't utilize pain compliance."[81] According to Grievant, this form of escort was appropriate for a "passive resistor."[82] The visitor walked toward the door with one hand on his phone and the other in his pocket.[83] The visitor then began to resist the escort, pushing back into Grievant.[84] Grievant pushed harder to continue the effort to usher the visitor outside, having determined that the visitor was now an "active resistor."[85] The visitor then grabbed the door frame, resisted Grievant's efforts to restrain him, and attempted to return to the ER.[86] The resulting struggle caused Grievant's body-worn camera to fall to the ground.[87] According to Grievant, the visitor used the door "as leverage" to try to return to the ER.[88] Grievant grabbed at the visitor to try to stop him from returning to the ER, but the visitor seized both door frames and lowered his body.[89] Grievant also lowered his own

---

[79]　　*Id.*

[80]　　Tr. 319-20. A "to/from" is an internal memorandum that is used for a variety of matters. Tr. 138.

[81]　　Tr. 204.

[82]　　Tr. 220.

[83]　　Tr. 204, 220.

[84]　　Tr. 184, 205.

[85]　　*Id.*

[86]　　Tr. 205-06.

[87]　　Tr. 184, 206.

[88]　　Tr. 207.

[89]　　Tr. 208-09.

17

body in order to prevent the visitor from gaining more leverage.[90] The visitor let go of one door and was falling to the ground, while Grievant tried to hold the visitor up to prevent him from falling.[91] During this struggle, Grievant injured his right ankle and as a result, he fell onto his right side.[92]

As Grievant was on the ground, the visitor stood over him but then also fell.[93] Grievant tried to get up as quickly as he could, still intent on prevent the visitor from getting back into the ER.[94] Grievant made an effort to put the visitor "against the fence to do a wrist lock on him and wait for more units to come. . . ."[95] Grievant attempted to pull the visitor up and hold the visitor's right wrist, as Grievant's gun was on his right side.[96] Grievant was able to get the visitor against the fence with a wrist lock and called for assistance using his radio.[97] Officer Roberson came to assist, along with another security officer who is typically in the back of the ER where the patients are located.[98] Officer Roberson took over the wrist lock that Grievant had placed on the visitor.[99]

---

[90]     Tr. 209.

[91]     Tr. 184, 209, 210.

[92]     Tr. 185, 209.

[93]     Tr. 211.

[94]     Tr. 211-12.

[95]     Tr. 212.

[96]     *Id.*

[97]     Tr. 213.

[98]     Tr. 214-15.  Neither Roberson nor the other officer was able to locate the patient that the visitor was trying to visit. *Id.*

[99]     Tr. 215.

After he released the visitor from the wrist lock, Officer Roberson retrieved Grievant's body camera, and the recording of the camera resumed.[100] The two security officers blocked the visitor from returning to the ER with their bodies.[101] Roberson told the visitor that he was not coming back in to the ER and the visitor walked up to him and said "You're going to shut the fuck up talking to me."[102] The visitor then stopped trying to return to the ER.[103] The visitor made several statements outside the ER that are recorded on the body camera, including "Y'all acting like you're the only mother fucker with a gun."[104] The visitor also made a "somewhat unintelligible" statement to the effect of "Let somebody else touch me I am blank on their ass."[105] These two statements, captured on the body camera were similar to the statements the visitor was making during the entire incident.[106] By this point Sergeant Troy Dequaine had arrived at the scene outside the ER.[107]

Dequaine walked up to Grievant who told Dequaine that the visitor was trying to enter the hospital without identification.[108] Grievant informed Dequaine that the visitor had been asked repeatedly to produce identification and then was asked to leave the hospital.[109] Grievant

---

[100]    Tr. 215, 221.

[101]    Tr. 215, 216.

[102]    Tr. 221.

[103]    Tr. 215.

[104]    Tr. 223.

[105]    *Id.*

[106]    *Id.*

[107]    Tr. 101, 223.

[108]    Tr. 224; Jt. Exh. No. 3.

[109]    *Id.*

told Dequaine that he "had to physically take him out."[110]  Grievant also said, "I grabbed him and just put him out here."[111]  Grievant further stated, "I physically grabbed him and pushed him out the door."[112]  After additional interaction with the visitor, Dequaine asked Grievant whether there was anything else he needed to know.[113]  Grievant responded "I grabbed him and just put him out here."[114]  Grievant stated again that he "physically grabbed [the visitor] and pushed him out the door."[115]  Grievant responded that he "used force to remove the individual,"[116] but he did not describe the incident in the detail that he offered in his testimony during the hearing.[117]

Grievant did not specifically tell Dequaine that the visitor "was guilty of trespassing and should be arrested."[118]  Sergeant Dequaine told Grievant to "[p]ut notes in your name."[119]  An officer asked Grievant if he was "all right" and Grievant indicated that he was fine.[120]  According to Grievant, he didn't realize at the time that he was injured, either because of "adrenaline" or because his ankle had not yet swollen.[121]  The visitor who had been put out of the ER was talking

---

[110]     *Id.*; Jt. Exh. No. 3.

[111]     Tr. 227; Jt. Exh No. 3.

[112]     *Id.*

[113]     Tr. 294.

[114]     Tr. 227; Jt. Exh. No. 3.

[115]     *Id.*

[116]     *Id.* While Grievant's testimony used the word "force," he did not use the word "force" when talking to Dequaine, as evidenced by the video. Jt. Exh. No. 3.  He used the words "grabbed him" and "pushed him out the door."  Jt. Exh. No. 3.

[117]     Tr. 289-93.

[118]     Tr. 273.

[119]     Tr. 228.  As described by Dequaine, routine incidents are document by putting notes into a data information system rather than a formal police report.  Tr. 119-20.

[120]     Tr. 225.

[121]     *Id.*

20

to someone on the phone and made several statements about what happened in the ER.[122]  He

stated, "Security just put me out.  I physically followed security."[123]  The visitor also said, "He

just physically pushed me out so I just physically flipped his ass."[124]  These statements were

made in the presence of the more senior police officers on the scene, including Dequaine.[125]

A probationary police officer was on the scene, along with his field training officer.[126]

Grievant said to the two officers that he didn't "know what we are doing with this."[127]

According to Grievant, he was unsure about the approach the officers were taking in response to

the incident, in part because his sergeant had told him to "put notes in" when Grievant, in his

mind, had clearly indicated that he had "used force."[128]  Grievant did not think that putting in

notes was in accord with the policy when he had used force.[129]  He was also wondering why the

officers were continuing to wait outside when the visitor was outside and not attempting to

reenter the hospital.[130]

After the incident ended, Grievant went back into the hospital and sat down.[131]  When he

tried to get up, he could not do so, realizing that his ankle was swollen.[132]  He then called

---

[122]     Tr. 226.

[123]     Tr. 225

[124]     Tr. 226.

[125]     Tr. 226-27.

[126]     *Id.*

[127]     *Id.*

[128]     *Id.*

[129]     *Id.*

[130]     Tr. 230.

[131]     Tr. 231.

[132]     *Id.*

Dequaine and told him that he was injured in the incident.[133]  Grievant was treated at the hospital for the injury to his right ankle and then released at about 7:50 a.m. with a cast on his ankle, unable to drive or to walk without assistance.[134]  When he returned to the security office, the captain on duty told him that Captain Randall Shannon wanted him to enter a "to/from" about the incident.[135]  The captain told Grievant not to "worry about the TRR [Tactical Response Report], it has already been submitted."[136]  Grievant then prepared the "to/from" as directed and went home.[137]

As Grievant was preparing the "to/from," he saw the police report about the incident prepared by the probationary officer on the scene, Gabriel Perez.[138]  The report included a supplement added by Shannon at 5:27 a.m. which stated, "TRR completed."[139]  Grievant has never seen that TRR and to his knowledge, it was not completed.[140]  A General Order provides that if an employee is unable to fill out a TRR because of injury, a supervisor should prepare the document.[141]  Shannon testified that he wrote the supplement, and the language "TRR

---

[133]    *Id.*

[134]    Tr. 235; Union Exh. No. 4.

[135]    Tr. 235.

[136]    *Id.*  A TRR is completed when an officer uses force, whether or not the force is lawful.  Tr. 362.

[137]    Tr. 235, 237, 241; Jt. Exh. No. 5, Bates Nos. 108-09.

[138]    Tr. 229, 237; Jt. Exh. No. 5, Bates Nos. 110-11

[139]    Tr. 237-39; Jt. Exh. No. 5, at Bates No. 111.

[140]    Tr. 238-39.

[141]    Tr. 240-41; Jt. Exh. No. 5, at Bates Nos. 150-51.

completed" was intended to convey that the TRR would be completed by the officer.[142] According to Shannon, "[n]obody would complete any TRR for [Grievant]."[143]

When asked whether he had observed similar incidents at the hospital, Grievant testified about an incident that occurred after his return to work from the ankle injury and military leaves[144] that followed the November 20th incident.[145] In that incident, an officer handcuffed a woman who refused to leave the hospital, but when she then agreed to leave, the officer took off the handcuff and physically guided her out.[146] Grievant asked the field training officer whether they needed to make an arrest or complete a "to/from" and the officer said that it was not necessary as this happened regularly.[147] Grievant did not know whether the officers present had asked the staff whether or not they wanted to press trespassing charges against the woman prior to placing her in handcuffs.[148] Grievant completed a complaint refusal form and "put in notes" regarding the event after discussion with the field training officer, as he was concerned about not doing so based on his prior experience.[149]

---

[142]     Tr. 333.

[143]     *Id.*

[144]     As discussed below, Grievant's ankle injury necessitated a leave, and he was subsequently called to active duty with the military before returning to work.

[145]     Tr. 319. Grievant also testified that he has seen officers "physically remove individuals" using "a level 1 of force" without making an arrest. Tr. 318-19.

[146]     *Id.*

[147]     Tr. 319-20. A "to/from" is an internal memorandum that is used for a variety of matters. Tr. 138.

[148]     Tr. 323.

[149]     Tr. 323-24.

2.    Testimony of Sergeant Dequaine

Sergeant Dequaine responded to Grievant's request for assistance at the ER on February 20, and, upon arriving at the scene, observed Grievant and an unknown man outside the doors to the ER.[150]  Grievant was standing to the side and two security officers were standing in the doorway to the vestibule, while the unknown man was shouting at them.[151]  According to Dequaine, the scene, with a person shouting at security officers who were blocking him from reentering the hospital, was not unusual.[152]  Grievant appeared calm and did not indicate any pain or distress.[153]  Dequaine asked Grievant what happened.[154]   After Grievant provided initial information to Dequaine about what happened, Dequaine asked, "[a]nything else I need to know?"[155]  After Grievant indicated there was nothing further, Dequaine said, "That's it?"[156] Grievant replied, "Yeah, I didn't handcuff him or anything."[157] Dequaine heard Grievant say, "I grabbed him and I put him out," as Grievant moved his hands forward to illustrate the motion he used with the visitor.[158]

---

[150]    Tr. 105, 107.  Dequaine's body-worn camera was malfunctioning that night so no video from the camera is available.  Tr. 105-06.

[151]    Tr. 107.

[152]    Tr. 135-36.

[153]    Tr. 107-08.

[154]    Tr. 107. The video recording does not reflect Dequaine asking a question to Grievant, but rather the Grievant explaining to Dequaine that the visitor refused to provide identification and refused to leave so Grievant had to "physically take him out."  Jt. Exh. No. 3.

[155]    Tr. 113; Jt. Exh. No. 3.

[156]    Tr. 113.

[157]    *Id.* The video reflects that Grievant also replied, "that's it." Jt. Exh. No. 3.

[158]    Tr. 113-14.

Based on his interaction with Grievant and the "testimony on the scene," Dequaine determined that nothing out of the ordinary had occurred.[159] He did not believe that Grievant had used force but instead concluded, "[I]t was a routine person was asked to leave. We may put our hands on their back or maybe grab their sleeve and kind of walk with them out the door. I did not think that there was any type of force used or anything like that."[160]

After learning of Grievant's injury by phone at about 2:43 a.m., Dequaine told Grievant to proceed to the Adult ER for treatment.[161] Dequaine retrieved the paperwork that had to be completed regarding the injury and went to the ER, where he "likely asked [Grievant] what had happened and I believe he told me he had tripped and fallen."[162] Dequaine provided Grievant with the paperwork that he needed to complete and also completed a supervisor's report of the injury.[163] Dequaine's report responded to the question about what the employee said had happened by stating, "While escorting an irate visitor from the ER [Grievant] tripped and twisted his right ankle."[164] According to Dequaine, this statement was based on information provided to him by Grievant.[165]

Grievant's ankle injury prompted Dequaine to do further investigation, as to what had actually happened"[166] Dequaine decided to review the body-worn camera footage, and while his

---

[159]    Tr. 109, 114-15.

[160]    Tr. 115.

[161]    Tr. 122.

[162]    Tr. 122-23.

[163]    Tr. 124-26; Jt. Exh. No. 5, Bates No. 107.

[164]    *Id.*

[165]    Tr. 126-27.

[166]    *Id.*

own body-camera footage was not viewable, he was able to view the recording from Grievant's camera.[167] Dequaine also viewed the recording from the security desk camera in the ER.[168] Dequaine was unable to find anyone who saw the incident involving the removal of the visitor from the ER, however.[169] Dequaine was surprised by the extent of the physical contact between Grievant and the visitor he was escorting that was visible in the video.[170] Based on the video footage that he watched, Dequaine concluded that he would not have told Grievant to "put in notes" regarding the incident, but instead would have told him to prepare a police report and a Tactical Response Report.[171] According to Dequaine, Grievant should have been more descriptive about what occurred and provided more detail regarding the subject's resistance and the fact that the two of them wrestled and fell to the ground.[172]

After reviewing the camera footage, Dequaine prepared a "to/from" for Captain Shannon about the incident before leaving work that morning.[173] Dequaine wrote the "to/from" to document and explain his own actions in case there was a complaint from the visitor who was removed from the ER.[174] He believed that "there were some things missing from what Officer Jallow had told me,"[175] and the missing information had prevented him from making the correct

---

[167]     Tr. 106, 109, 127-28.

[168]     Tr. 128-29.

[169]     Tr. 111-12.

[170]     Tr. 130-32

[171]     Tr. 121.

[172]     Tr. 133-34.

[173]     Tr. 116-17; Jt. Exh. No. 5, Bates Nos. 97-98.

[174]     Tr. 117.

[175]     *Id.*

decision as a supervisor.[176] The memorandum stated that Grievant had not indicated to Dequaine that there was a use of force or that Grievant was injured when Dequaine had arrived on the scene.[177] It also documented Dequaine's question to Grievant and his answer, noting that Dequaine interpreted the answer as indicating that Grievant had grabbed the visitor's jacket and "guided him out of the door without incident."[178] Dequaine quoted Grievant's statement that he grabbed the subject but did not quote Grievant's statement that he "pushed or pulled" the subject because it was not in his memory at the time he wrote the memo.[179] Dequaine stated in the memo that he had "cleared the scene," believing no use of force occurred, instructing Grievant \ to "enter notes into the disturbance ticket."[180] He described his actions after learning of Grievant's injury.[181] After receiving a call from Grievant, Dequaine told Grievant to proceed to the Adult ER for treatment, and he then went to the ER to retrieve Grievant's gun belt and vest, returning them to the police headquarters.[182] Dequaine's memo then described in detail what Dequaine saw on the body-worn camera and security footage as Grievant removed the visitor from the ER.[183]

---

[176]   Tr. 139.

[177]   Jt. Exh. No. 5, Bates No. 97.

[178]   *Id.*

[179]   Tr. 137.

[180]   Jt. Exh. No. 5, Bates No. 98.

[181]   *Id.*

[182]   *Id.*

[183]   *Id.*

### C. The Aftermath and Investigation of the November 20, 2022, Incident

The following day, at the request of Shannon, who had noticed no TRR had been completed when he came on shift at 6:00 p.m., Dequaine emailed Grievant and asked him to complete a TRR regarding the incident.[184] Grievant completed the form, including the sections regarding the "Reasons for Use of Force."[185] For the "Passive Resister," under "Subject's Actions," Grievant checked the box "Failed to Comply with Verbal or Other Direction" as the visitor had refused to show his identification and refused to leave the hospital when requested.[186] For the "Employee's Response," Grievant checked the box for "Escort Hold" as that was the only box that fit.[187] Under "Active Resister," for the "Subject's Actions," Grievant checked the box "Pulled Away, " although he testified that if he could make a correction, he would place a check in the box "Other" and add that the visitor was trying to "charge into the ER."[188] In the box for "Employee's Response" for the "Active Resister, he checked "Other" and wrote in "wrist lock," as all of the other options listed were levels of force in excess of what Grievant used.[189] Although Grievant was on painkillers at the time he prepared the report, he did not tell anyone that he was incapable of completing it.[190]

---

[184]    Tr. 241, 334; Er. Exh. No. 3.

[185]    Tr. 241-43, 334-35; Jt. Exh. No. 5, Bates No. 112.

[186]    Tr. 242; Jt. Exh. No. 5, Bates No. 112.

[187]    *Id.*

[188]    *Id.*

[189]    Tr. 242-43; Jt. Exh. No. 5, Bates No. 112.

[190]    Tr. 301, 336-37.

Deputy Chief Joanne Nee was assigned to investigate the February 20th \incident involving Grievant.[191] The misconduct allegation against Grievant was his failure to report the use of force.[192] As a part of the investigation, Nee interviewed Grievant and Dequaine and watched the video from the Employer's surveillance cameras and Grievant's body-worn camera.[193] She did not interview anyone from the security staff as she felt the video evidence was sufficient.[194] The hospital surveillance does not have audio so although Nee could see Grievant talking with the visitor and could see the visitor's actions, she could not hear anything that was said prior to Grievant's activation of his body-worn camera.[195] Nee heard the following statements from Grievant to Dequaine on camera after the incident: 1) "'I just grabbed him and put him out here;'" 2) "I physically grabbed him and either pushed him or moved him out the door. I think he said, 'I pushed him out the door;'" and 3) "That he never put cuffs on him or anything like that."[196] Nee concluded that what Grievant told Dequaine was not consistent with the level of force actually used, which was visible on the videos.[197] According to Nee, Grievant merely mentioned that he pushed the visitor out while he was actually wrestling with the visitor.[198] Nee testified that knowing the level of force used is important to insure compliance

---

[191]     Tr. 19, 21, 25-26.

[192]     Tr. 26.

[193]     Tr. 26.

[194]     Tr. 82-83.

[195]     Tr. 83-84.

[196]     Tr. 28-29.

[197]     Tr. 30.

[198]     Tr. 38.

with Employer policy and training, as well as for liability purposes, particularly in light of the current scrutiny on police officers' use of force.[199]

Nee also concluded that Grievant failed to properly report the level of force used in the ER in the "to/from" memo that he wrote to Captain Shannon on November 20.[200] In that memo, Grievant stated that he "proceeded to physically escort the individual out of the building. The individual resisted [Grievant's] escort during which he rolled his ankle exiting the building with the individual."[201] According to Nee, there was initially an escort with Grievant's hands pushing the visitor, but then Grievant is "grappling with him and he's pulling him and yanking him off the door… He almost pulls him off of his feet. He has his arms around - - he has him in a headlock almost and he gets him and pulls him and pins him against the railing for 20 seconds or more."[202] Similarly, Nee found that the TRR completed by Grievant did not accurately describe the level of force used.[203] Contrary to what he wrote on the TRR, Grievant did not use a "traditional escort hold," which does not involve using hands to push a person's back.[204] Nee could not see a wrist lock on the video but one might have been used, as Grievant indicated, though not visible.[205] Grievant did not include information on the form indicating that the visitor

---

[199]    Tr. 40.

[200]    Tr. 43; Jt. Exh. 5, Bates No. 108.

[201]    Tr. 44; Jt. Exh. 5, Bates No. 108.

[202]    Tr. 45-46.

[203]    *Id.*

[204]    Tr. 47-48.

[205]    Tr. 48-49.

tried to "take [Grievant] down" or that Grievant wrestled with the visitor to get him out of the ER and then pinned him against the railing.[206]

As a part of her investigation, Nee interviewed Grievant twice in March 2023, after he returned to work from his leave caused by the ankle injury.[207] Grievant was accompanied by counsel and the interviews were recorded and transcribed.[208] According to Nee, prior to reviewing the video, Grievant did not remember some of the details of the incident and failed to describe the level of physical force used in the incident.[209] After reviewing the video, Grievant included more detail.[210] Grievant's reason for escorting the visitor out of the hospital was that he was "an imminent threat to the safety of the staff."[211] Nee did not agree, on viewing the video, that there was any imminent threat, nor did she conclude that the visitor was trespassing, inasmuch as the visitor was not warned that he was trespassing and must leave "which is customary and required by the statue and customary with policy and practice at the University."[212]

The interview with Grievant took place in two sessions because of technical difficulties with Nee's computer.[213] While officers are not shown video of the events in question before an

---

[206]    Tr. 49-50.

[207]    Tr. 51-52.

[208]    Tr. 53; Jt. Exh. No. 5, Bates Nos. 120-139.

[209]    Tr. 53-55.

[210]    Tr. 55.

[211]    *Id.*

[212]    Tr. 57-58.

[213]    Tr. 52.

interview, the recordings were shown to Grievant *during* the interview.[214]  The investigator, who had viewed the video prior to the interview, asked Grievant a number of questions pertaining to his confrontation with the visitor.[215]  Neither Grievant nor his counsel asked to see any additional parts of the video recordings that were not shown in the interview.[216]

Based on the investigation, Nee concluded that Grievant "underreported the level of force that he used, that he was untruthful in reporting the level of force that he used on the level of force report, tactical response report, and that he exacerbated the untruthfulness when he prepared the memorandum to Captain Shannon."[217]  She also concluded that he did not truthfully report the use of force when he spoke with Sergeant Dequaine immediately after the incident.[218]  Nee testified that officers were trained to list all types of force used on the TRR, even if not listed on the form or in the use of force policy, and other officers have done so.[219]

With respect to the use of force, Nee concluded that Grievant's use of force was "unwarranted" and "excessive."[220]  From the video, there did not appear to be an imminent threat from the visitor, as Grievant appeared calm and relaxed and once the audio is available through the body-worn camera, the visitor says nothing threatening.[221]  Instead of the immediate escort out, Grievant could have waited for back-up, used more de-escalation techniques, asked for a

---

[214]   Tr. 74, 75.  While at one time officers were allowed to view relevant video before their interview, the policy was changed at some time not revealed in the record.  Tr. 357-58.

[215]   Tr. 74-79; Jt. Exh. No. 5, Bates, No. 122.

[216]   Tr. 340.

[217]   Tr. 59.

[218]   Tr. 60.

[219]   Tr. 341-46, 349; Er. Exh. No. 4.

[220]   *Id.*

[221]   Tr. 97-99.

complaint of trespass from the staff, or placed the visitor in custody.[222] Officers are not permitted to remove individuals from property solely because the owner wants them removed.[223] There must be a complaint of trespass followed by de-escalation techniques and a warning and then an arrest.[224] Nee prepared a memorandum for Associate Vice President for Safety and Security Eric Heath incorporating her findings and recommending termination based on the severity of the misconduct, the dishonesty, Grievant's short length of service and lack of remorse, as well as past practice in similar cases.[225] Heath agreed with Nee's findings and recommendation, particularly because of the importance of honesty and integrity for a police force.[226] Heath estimated that six or seven staff have been terminated for dishonesty since 2015.[227] Grievant's relatively short tenure with the Employer was a factor for Heath, as well as the lack of remorse.[228]

Grievant was called to active military duty immediately after his second investigative interview with Nee and did not return to employment with the Employer until March 2024.[229] Grievant was placed on administrative leave on April 8, 2024, and terminated on April 11, 2024, when he was also given a letter summarizing Nee's findings.[230]

---

[222] Tr. 61.

[223] Tr. 349, 351.

[224] Tr. 350-52.

[225] Tr. 59, 62-64; Jt. Exh. No. 5, Bates Nos. 90-94.

[226] Tr. 153-54.; Jt. Exh. No. 5, Bates No. 89.

[227] Tr. 154.

[228] Tr. 155.

[229] Tr. 64; Jt. Exh. No. 6.

[230] Tr. 65-66; Jt. Exh. No. 5, Bates Nos. 170-71, Jt. Exh. Nos. 6, 7.

In the second step grievance answer, Deven Swanigan, Senior Consultant for Employee and Labor Relations wrote that Grievant's statement to Dequaine immediately after the incident and his physical gestures indicated that Grievant "did not intend to deny using force."[231] Swanigan then wrote that Grievant was not dishonest in his communication to Dequaine "although the description was insufficient."[232] Swanigan testified that the statement was his own opinion based solely on the communication with Dequaine and that Grievant underreported the level of force on subsequent written reports and did not use de-escalation tactics.[233] Swanigan denied the grievance at the second step, declining to overturn the termination.[234]

A previous situation involving discipline for use of force occurred in 2019.[235] An officer was alleged to have used excessive force during a confrontation with a citizen and failing to notify his supervisor or document the incident.[236] The investigation concluded that the allegations were sustained and the officer was given a five-day suspension and required to take remedial training.[237] The case involved similar violations of general orders as in Grievant's case, including use of excessive force, and failure to document the use of force with a TRR.[238]

The investigation report of the incident stated that the officer, "without threat or provocation, grabb[ed] the front of [a citizen's] shirt, then push[ed] him backward."[239] The man

---

[231]    Tr. 161-63; Jt. Exh. No. 2, p. 4.

[232]    *Id.* Heath testified that he did not agree with Swanigan's statement in the grievance answer. Tr. 157-58.

[233]    Tr. 165-66.

[234]    Tr. 163, 166-67.

[235]    Tr. 67; Union Exh. Nos. 5, 6, 7, 8.

[236]    Tr. 69; Union Exh. No. 5.

[237]    Tr. 70; Union Exh. No. 5, Bates No. 179, Union Exh. No. 6, Bates Nos. 187-88.

[238]    Tr. 70-71; Union Exh. No. 5, Bates No. 179.

[239]    Jt. Exh. No. 5, Bates No. 174.

34

fell and the officer tumbled on top of him, subsequently "aggressively" pulling the man up and escorting him out of the building, pushing him in the back several times.[240]  The incident occurred at a club, which had called the police department for assistance regarding a suspicious person.[241]  Three other officers were accused of failing to report the use of excessive force.[242]  Two were issued written corrective actions for the failure to report and required to take remedial training.[243]  Each of these officers had more time on the job at the time of the discipline than Grievant.[244]  The officer who used excessive force had over nine years of service and the two who observed and failed to report the incident had more than 18 years and almost five years of service.[245]  The length of service played a role in the disciplinary decision because the offices had "demonstrate[d] their value to the department."[246]  None of those officers was accused of dishonesty according to Nee, although none of them reported the incident and she acknowledged that failure was "related to untruthfulness."[247]  The officer accused of excessive force did not try to minimize his actions, and admitted he was wrong and had violated policy by using excessive force and failing to report what occurred.[248]

---

[240]    *Id.*

[241]    *Id.*

[242]    Tr. 71-72; Union Exh. Nos. 7, 8.

[243]    *Id.*

[244]    Tr. 87-88; Union Exh. No. 5, Bates No. 172.

[245]    *Id.*

[246]    Tr. 94.

[247]    Tr. 88, 91.

[248]    Tr. 90-91, 93; Union Exh. No. 5, Bates No. 177

## V. <u>SUMMARY OF THE PARTIES' CONTENTIONS</u>

### A. Employer's Position

Grievant was repeatedly dishonest about what occurred on February 20 and has consistently claimed that all that occurred was a passive escort from the ER. Instead, however, Grievant physically pulled the visitor several times, grappled with him, causing the visitor to fall. Greivant stood over the visitor while making contact with him, and he pinned the visitor to a fence for about 20 seconds. Grievant intentionally misled the Employer about the event. Despite multiple opportunities to provide a full accounting, Grievant never told the whole story to his supervisors. Grievant's hearing testimony undermines his credibility as he declined to provide clear answers to questions on cross-examination and instead repeatedly persisted in offering his own version of the incident. The video of the incident does not support Grievant's assertion that the visitor was a threat to the staff. Grievant's testimony is nonsensical in several respects, further undermining his credibility. For example, Grievant claimed that he was wondering why the visitor wanted to come back into the ER while grappling with him, which seems highly unlikely given the potential risk at that moment.

Given Grievant's lack of credibility and poor decision-making, the decision to terminate was for just cause. Prosecutors, defense lawyers, judges and juries must be able to trust that Grievant will accurately describe his actions. Police officers are under significant scrutiny regarding their interactions with citizens and their truthfulness in reporting such interactions. Further, *Brady v. Maryland*, 373 U.S. 83 (1963), requires prosecutors to disclose to defendants all material and exculpatory information. Grievant's misconduct involving dishonesty is the type of information that would have to be disclosed, putting at risk any prosecutions in which he was involved. Illinois public policy precludes employment of dishonest police officers. In addition, Grievant would pose a liability risk for the Employer in any encounter with a citizen.

Grievant's short tenure with Employer and the absence of any remorse or acknowledgement of wrongdoing further support termination. Grievant's continued denial of any fault established that he has not learned from this experience and poses the same risk in the future. Moreover, the Employer has not treated other similarly situated officers differently, terminating other officers for dishonesty as well. Termination of Grievant is consistent with the Employer's policy and prior actions and should be upheld.

### B. Union's Position

The Employer has the burden of proving just cause and has not done so. It has failed several of Arbitrator Daugherty's seven tests of just cause.[249] The Employer failed to provide forewarning of consequences to Grievant. Grievant provided sufficient information to his supervisor, Dequaine, to alert the supervisor that force was used, yet the supervisor instructed him to put in notes instead completing a TRR. Only after viewing the video recordings did Dequaine prepare a self-serving "to/from" that omitted important information provided to Dequaine by Grievant. There was no intent to conceal the use of force by Grievant, as evidenced by his activation of the body-worn camera and calls to dispatch during the incident. When asked to complete a TRR, Grievant complied and no supervisor, despite Dequaine having viewed the video, contacted him to provide more information. The Employer did not conduct a fair and objective investigation. Dequaine's "to/from" omitted Grievant's statements that revealed the use of physical force. Nee's interview questions followed the mischaracterizations in Dequaine's memo, resulting in the use of questions that diverged from facts revealed by camera footage that Grievant had not seen and required Grievant's response months after the incident. Grievant's efforts at de-escalation were ignored in the Employer's reports and investigation.

---

[249]    *Enterprise Wire Co.*, 46 LA 359, 362-65 (1966).

The Employer's investigation did not find evidence of improper conduct by Grievant in his interactions with the visitor. The visitor refused to identify himself, made threatening movements toward the treatment area of the ER and failed to leave when asked. Employer policies provide that the reasonableness of force should be judged from the perspective of a reasonable officer at the time. Grievant acted reasonably to prevent the incident from escalating into a more dangerous situation. Grievant even continued to use techniques for passive resistors after all agree that the visitor became an active resistor. There is no substantial evidence supporting cause for termination. Further, the Employer has imposed lesser discipline on employees involved in similar but more serious violations, constituting disparate treatment. Finally, the discipline imposed here is too severe for any violation found. Grievant had no prior discipline and several commendations, one involving use of force. Grievant is amenable to corrective discipline as evidenced by his hearing testimony and his conduct on the job after the incident, demonstrating that he has learned from his experience.

## VI. DISCUSSION AND FINDINGS

Arbitrators have long held that in discipline cases, the burden is on the Employer to establish just cause for discipline.[250] The Employer must prove both that the employee committed the offense charged and that the level of discipline imposed is warranted by the circumstances. Here the Employer had two bases for discipline of Grievant. Grievant was terminated for both use of excessive force and dishonesty regarding the use of force in both communications with his supervisor on the scene and written reports about the incident.

---

[250]    Elkouri & Elkouri, *How Arbitration Works* 15-25 (8th Ed. Kenneth May, Editor-in-Chief, 2016).

Most of the facts are undisputed as a result of the availability of recordings, written documents and transcripts, although the Employer challenges the credibility of Grievant and his explanations for the decisions that he made during the incident.

### A. Use of Force

The General Order regarding the use of force provides that "[e]mployees will only use reasonable force based on the totality of the circumstances to perform a lawful task, effect an arrest, overcome resistance, control a subject, or protect themselves or others from injury."[251] The order states that the reasonableness will be determined based on "the totality of the circumstances viewed from the perspective of a reasonable officer on the scene."[252] Further, the order provides factors to be used to determine the reasonableness of a use of force including the severity of the crime, whether there is an immediate threat to the safety of the officer or others and whether the subject is resisting arrest.[253] Also, the officer should utilize de-escalation where "appropriate and practicable" to minimize the need for use of force or the level of force needed.[254] The order goes on to say that an individual should be given the chance to comply with verbal commands before force is used unless a delay will "compromise . . . safety," or permit destruction of evidence, escape or "commission of a crime."[255]

The Employer contends that any use of force to remove the visitor from the ER was improper as he did not pose an imminent threat to anyone on the scene and had not committed any crime for which he could be charged. Grievant had not secured a trespass complaint from

---

[251]    General Order 108.3 B, Jt. Exh. No. 5, Bates No. 142.

[252]    General Order 108.3 C, Jt. Exh. No. 5, Bates No. 143.

[253]    *Id.*

[254]    General Order 108.3 D, Jt. Exh. No. 5, Bates No. 143.

[255]    General Order 108.3 E, Jt. Exh. No. 5, Bates No. 143.

the hospital staff prior to removing the visitor, the visitor was not warned that he was trespassing and subject to removal, and no arrest was attempted.  On the other hand, it is clear from witnesses that there are "routine" removals from the ER that do not involve any arrest or formal complaint of trespassing.  Indeed, Dequaine testified that he assumed based on what Grievant reported to him that this was a routine removal, where "[w]e may put our hands on their back or maybe grab their sleeve and kind of walk with them out the door."[256]  This description seems very close to what Grievant did in the instant case, although Grievant's TRR and testimony classified his actions as an *escort hold*, a technique that does not impose any pain.  The description of holding techniques in General Order 108.4 A.1, which is the section that Grievant cited in his report, describes holding techniques "applied to the limbs,"[257] however, and Grievant had his hands on the visitor's shoulders, guiding him out.  Nee's testimony also described Grievant's actions as a use of force.

Grievant does appear to have classified his own actions as a use of force for a passive resister.  If he had simply put his hands touching the visitor's back and guided him out as opposed to putting his hands on his shoulders, it would have been a routine removal and not covered by the use of force policy.  Given that there was a use of force, the question is whether it was justified based on what Grievant knew at the time.  Grievant's testimony was that he feared the visitor would dart back to the treatment area of the ER, where Grievant was concerned about the proximity of oxygen tanks.  But at least at the hearing, Grievant indicated he did not fear imminent harm to himself or others in the ER.  Grievant also based his decision on his determination that the visitor was trespassing, although Grievant did not have a formal complaint

---

[256]    Tr. 115.

[257]    General Order 108.4 A.1, Jt. Exh. No. 5, Bates No. 144.

of trespass from hospital staff. At most, the security officer had told the visitor to leave as he did not have a current pass and refused to show the identification necessary to obtain one. Although Grievant testified that it was not unusual to escort a person out and then ask the staff members whether they wanted to file a complaint of trespass or sign a "complaint refusal form," Nee indicated that the complaint should be secured first and the individual warned before removal. Grievant asked the visitor if he would leave voluntarily, to which the visitor replied, "I'm not."[258] Grievant, however, did not specifically warn the visitor that he would be charged with trespassing if he failed to leave.

Accordingly, it appears that Grievant violated policy by failing to obtain the official complaint of trespassing prior to removing the visitor. Although Grievant testified that it was not uncommon to remove visitors and then obtain a complaint refusal form, that does not appear to be in accord with policy, as Nee testified. Viewed from the perspective of a reasonable officer at the time, however, there were several factors that indicated that the visitor potentially posed some risk. The visitor repeatedly refused to show identification to obtain a current pass despite claiming that he already had a pass, which meant he would have had to show identification to obtain the pass. Additionally, the visitor never provided the name of the person he was there visiting. He was abusive to staff, paced around the ER waiting room, and sat in an area reserved for patients. When members of the nursing staff came out of the treatment area, the visitor approached them in an effort to access the patient area. Finally, the visitor refused to leave when asked to do so. Clearly, the visitor was trying to enter the area where patients were being treated without authority to do so, although his reason was never made clear. The visitor could have easily prevented his removal by simply showing the identification he used to obtain the pass in

---

[258]    Jt. Exh. No. 3.

41

the first place. Yet he repeatedly refused to do so. Under these circumstances, Grievant's concern about the visitor and his intentions was not unreasonable, even though Grievant might not have feared imminent harm. Nevertheless, Grievant did not follow policy in all respects for escorting the man from the ER.

The Employer argues that Grievant's apprehension was not reasonable because the video does not show staff looking fearfully at the visitor. Instead, staff members were going about their business. It is not clear, however, that staff other than the security personnel were aware of the visitor's refusal to supply identification and or to name the person he was visiting. The Employer's investigation did not include interviews with any staff members, including the security staff who confronted the visitor and asked him to leave.

Nee's report of her investigation cites the Grievant for failing to use de-escalation techniques prior to escorting the visitor from the ER. Dequaine's memo, written after viewing the video, also fails to mention Grievant's efforts to persuade the visitor to leave voluntarily.[259] Grievant did, however, ask the visitor to show his identification during the initial confrontation over the pass, according to Grievant's testimony. This was not captured on the Grievant's audio recording because his camera had not yet been activated. Prior to escorting the visitor out, Grievant asked him twice whether he would leave voluntarily, and the visitor responded that he would not do so. Grievant testified that his palms were up as he had learned from experience that such a gesture often worked to disarm people engaged in a confrontation. While Grievant did not expressly warn the visitor that he was trespassing and subject to arrest, he did attempt to de-escalate the situation at least twice.

---

[259]     Jt. Exh. No. 5, Bates No. 98.

The Employer does not appear to contend that Grievant's escalation of his use of force, *once the visitor began to push back on him and try to get back into the ER,* was excessive in and of itself. That escalation, however, would not have occurred had Grievant not attempted removal without following proper policy. Nevertheless, the effort by the visitor to resist his removal and return to the ER supports Grievant's initial assessment that there was some risk from the visitor. The visitor's efforts suggest that there might have been a motivation other than simply seeing a patient.

### B. Reporting the Use of Force

The Employer does argue that Grievant consistently failed to properly report his use of force, which the Employer found to constitute dishonesty. The Employer cites several failures on the part of Grievant to accurately report the force used in the incident. The first is Grievant's oral report to his supervisor both immediately after the incident and again in the ER while Grievant's ankle was being treated. In neither conversation did the Grievant describe the level of force that he exerted on the visitor. The second failure is Grievant's "to/from" memo regarding the incident and the third is his written tactical response report about the incident. The Employer is quite correct that Grievant in no way detailed the struggle that took place between him and the visitor during the visitor's removal from the building in either his oral or written reports. On the other hand, Grievant did report that he "physically" took the visitor out, that he "grabbed him and put him out," and that he "grabbed him and pushed him out the door," motioning with his hands and at least once using his hands with clenched fists showing he was holding the visitor. This language and motion suggests more than the passive escort that Dequaine described, where the officer merely places a hand on the individual's back or grabs a sleeve to guide the person.

43

Accordingly, I believe that Grievant's language does indicate a use of force, but not the full level of force actually used.[260]

When Dequaine visited Grievant in the emergency room, asking how the injury occurred, Grievant explained that he had tripped and fallen while escorting the visitor. Again, this does describe the incident, but not in detail and does not reflect the level of struggle that occurred. Similarly, the "to/from" completed by Grievant was not inaccurate, but it failed to fully detail the level of struggle. The memo merely said Grievant "physically escort[ed]" the visitor and then the visitor resisted caused Grievant to roll his ankle.[261] The TRR identified the visitor as both a passive resistor and an active resistor and checked boxes for two techniques that Grievant used. It did not contain additional detail, however, and the evidence established that officers were trained that additional information could be included beyond the check boxes, and that other officers had included more descriptive detail in the TRR.

Accordingly, I conclude that Grievant underreported the scope of the incident by failing to provide the details of the visitor's resistance and resulting fall by both parties.[262] Further, while he indicated use of a wrist lock on the TRR, he did not adequately describe the force needed to get the visitor under control and outside of the ER. Grievant should have realized when Dequaine told him to "put in notes" that Dequaine did not understand the level of force from Grievant's description. Indeed, Grievant testified that he was surprised by Dequaine's directive and did not think it was consistent with policy. While Dequaine was his superior

---

[260]    I would also note that the visitor can be heard in the video after the incident in the presence of the responding officers stating that security physically "pushed him out" and that he [the visitor] "physically flipped his ass," referring to Grievant. While Dequaine may have ignored the visitor or dismissed this as bragging or exaggerating, further inquiry about the incident was arguably warranted.

[261]    Jt. Exh. No. 5, Bates No. 108.

[262]    As noted below, however, Grievant knew the incident would be fully captured on hospital security video, so any intent to mislead would have been futile.

officer and Grievant was relatively new on the job, Dequaine's direction should have signaled that Dequaine did not grasp the full scope of the encounter. At the same time Dequaine seems to have rather quickly jumped to the conclusion that no force was used, particularly in light of Grievant's language, Roberson's report that there was a physical altercation, and the actions and statements of the visitor regarding his actions. Dequaine did, however, ask Grievant if that was "it" after Grievant said he "grabbed" the visitor and "put him out here," and Grievant said "yeah that's it."[263] It is clear that Grievant should have provided a further explanation at that point.

## C. The Appropriate Penalty

Having found that the Grievant violated policy by using physical force to eject a visitor from the ER and subsequently underreported the level of force used, I turn to whether termination was the appropriate penalty. As the Employer has noted, public policy in Illinois requires honest police officers.[264] In *City of Country Club Hills v. Charles*, the Illinois Appellate court set aside an arbitrator's reinstatement of a police officer, converting a discharge to a written warning, where the officer was found to be dishonest on two separate occasions.[265] The court went on to say, "[e]ven so, we do not find, from our review of the case law, there is an absolute rule that any instance of police dishonesty must result in termination from service. Obviously, each case presents unique facts which must take into account, the officer's prior record, the benefits of progressive discipline, the culpability of the officer, and the potential peril to the municipality created by the particular dishonesty at issue."[266]

---

[263] Jt. Exh. No. 3.

[264] 2020 Ill. App. (1st) 200546, ¶ 23.

[265] *Id.* at ¶ 29. The court did not disturb the arbitrator's finding that there was conflicting evidence regarding a third basis for the termination, failure to follow a superior's order. *Id.* at ¶ 30.

[266] *Id.* at ¶ 35.

45

In support of its termination of Grievant, the Employer cites two previous arbitration cases involving the University of Chicago Police Department. In the first case,[267] Arbitrator Lisa Salkovitz Kohn upheld the termination of a police officer who repeatedly lied to a citizen, claiming he had a warrant for her son when he did not, even after the citizen informed him that her son's probation officer told her there was no warrant.[268] The officer also broke the door of the citizen's apartment by blocking her efforts to close the door, and then forced his way into the apartment over her refusal.[269] Arbitrator Kohn noted that the crime for which the officer was seeking the citizen's son was a "petty offense" and the son was already under electronic monitoring so could easily be located again if necessary.[270] Further, Arbitrator Kohn found that the officer was not truthful with his superiors about the confrontation after the incident, which later became the subject of an investigation after the citizen complained, and denied responsibility for his actions and the damage to the door, even at the hearing.[271] In upholding the termination, Arbitrator Kohn cited both the importance of public trust in the police department and the importance of departmental trust in its officers.[272] She also noted Grievant's relatively short tenure with the department.[273]

---

[267]   *Policemen's Benevolent & Protective Association of Illinois Local 185 and University of Chicago*, FMCS Case No. 15092-03522 (Kohn, 2016).

[268]   Slip op. at 19.

[269]   *Id.* at 20.

[270]   *Id.* at 21.

[271]   *Id.* at 22.

[272]   *Id.* at 22-24.

[273]   *Id.* at 24.

In the second case, the officer spent more than 30 minutes parked at a location where she could not see the bike rack that she had reported she was checking at the time.[274] She never approached the bike rack to make the required check, although bike theft was common at the University and bike rack checks were required in order to deter theft.[275] Arbitrator Steven Bierig found that the officer was dishonest in her report that she was observing the bike rack because evidence established that she in fact could not see the bike rack.[276] Further, she continued to maintain that she could see the bike rack during the investigation despite the evidence otherwise.[277] In addition, the officer, who had worked at the University for four years, had been disciplined shortly before the incident with a one-day suspension for leaving the University without permission.[278]

The Union, on the other hand, cites the instance where an employee was not terminated, but instead given a five-day suspension after using excessive force in a confrontation with a citizen and failing to report the confrontation at all. While Nee indicated that dishonesty was not involved in that case, I believe that failure to report an incident at all, where it was off University premises and might never have come to light, could certainly be characterized as dishonesty, perhaps more intentional than that involved in the instant case. The Employer distinguished the case as involving an employee with longer service who had proved his worth to the Employer before the incident. Further the Employer points out that the employee in that case acknowledged his error and expressed remorse.

---

[274]    *University of Chicago Police Department and Policemen's Benevolent and Protective Association, Unit 185*, Arb. No. 13-99, Slip op. at 9-11 (Bierig, 2014).

[275]    *Id.* at 9, 10.

[276]    *Id.* at 10, 11.

[277]    *Id.* at 11.

[278]    *Id.*

I do not find evidence in the instant case that Grievant intentionally misled his superiors about the force used in the incident. While his description can be characterized as underreporting the level of violence, he was aware that his actions would have been visually recorded on the hospital security cameras. Indeed, Grievant's written reports came after Dequaine had watched the recordings from both Grievant's body-worn camera and the hospital security cameras.[279] Accordingly, any effort to mislead would have been pointless. While Grievant left out of his description details that should have been included, unlike the two officers in the previous arbitrations, Grievant did not actively misrepresent the facts. Further the officer in the Kohn arbitration lied to a citizen and entered her home without a warrant, serious violations implicating citizen trust. Here Grievant failed to secure a trespass complaint prior to escorting the visitor out, but it was clear that security had repeatedly asked the visitor to leave. Moreover, Grievant testified without contradiction that on other occasions visitors had been escorted out successfully and security thereafter did not to file a complaint. While Grievant violated procedures, his actions were not nearly at the same level as the Grievant in Arbitrator Kohn's case.[280]

The Employer argues that Grievant's testimony was inherently contradictory in several respects, and thus he was either lying or exercising extremely poor judgment. For example, the

---

[279] Grievant knew prior to completing the reports that his superior officers had watched the video because it was mentioned in the Incident Report that he saw when he logged in to complete the "to/from." Jt. Exh. No. 5, Bates No. 111. Indeed, he believed when he saw the Incident Report that a TRR had already been completed regarding the incident, as a note by Shannon said "TRR Completed." While Shannon testified that no one would complete a TRR for the Grievant, the General Orders do provide that when an officer is unable to complete a TRR due to injury, a supervisor should complete the TRR.

[280] I would note that shortcuts develop commonly in workplaces where not every rule or policy is followed in precise detail, yet these are not considered serious violations or misrepresentations. For example, in the instant case, Captain Shannon wrote "TRR Completed" at 5:27 a.m. on the incident report when in fact none had been completed, and at that time there is no evidence that Grievant had even been asked to complete a TRR but instead a "to/from." Shannon testified that he wrote the language knowing it would be completed. While this saved Shannon time, it was in fact inaccurate when it was written. One would not characterize this as a serious violation or dishonest act, although it might technically fall in that category.

Employer questions why Grievant, if he perceived the visitor to be a threat, did not wait for back-up before escorting the visitor out of the building. In addition, Grievant testified that he was wondering why the visitor wanted to go back into the ER while Grievant was grappling with him. The Employer contends that in light of the struggle and the risk to the Grievant at that moment, it is highly unlikely that he was thinking about the reason the visitor wanted to return to the ER. Thus, the testimony is self-serving and not credible according to the Employer. Grievant also testified he was trying to hold the visitor up to avoid escalating the level of force, which the Employer characterizes as self-serving as well.

The Employer also notes that Grievant's testimony provided greater detail than that provided at the time of the incident, while Grievant asserts that his brief report to his supervisor that he "physically took the visitor out" should have been sufficient to put the supervisor on notice that force was used. I note that Grievant was testifying almost three years after the incident because of the delays occasioned by his leaves. Grievant had the advantage of seeing the video during the hearing and was reconstructing what had happened, using the video as a guide. It is thus not surprising that his testimony provided much more detail than his original report to his supervisor.

Grievant impressed me as an officer who was sincere, not defensive, and wanting to do the right thing. His actions did not properly follow procedure, yet he was making decisions about a visitor who refused to identify himself and was angry and abusive in a hospital with defenseless patients. His relatively short time on the job may have contributed to his failure to follow protocol precisely but it is difficult to condemn his motivation.[281] Again this

---

[281] Indeed, a recent incident in Evanston Hospital where a security officer was shot by a patient illustrates the risks in an emergency room where protection of vulnerable patients as well as staff is essential. Eric Horng, Security officer shot inside emergency room at Evanston Hospital, suspect in custody, police say, ABC 7, June 5, 2025.

distinguishes the case from Kohn's arbitration involving the officer who lied to a citizen about a warrant, broke her door and conducted a warrantless entry in pursuit of an alleged cell phone thief who already had an ankle monitor. For the same reasons, the instant case is distinguishable from the case of the officer who reported she was doing police work while making personal phone calls for over thirty minutes. The motive of the officer also distinguishes the instant case from the Illinois Appellate Court case discussed *supra*, *City of Country Club Hills*.[282] There the officer lied on *two separate* occasions, one where when asked to describe in detail how a prisoner escaped, the failed to report that he did not follow proper procedures and lock a booking room door which allowed the prisoner to escape which the arbitrator found was done with intent to deceive.[283] In the second incident, the officer failed to report to a club and falsely told his supervisor that he was engaged in other police work.[284] In the instant case, I find a laudable motive on the part of Grievant, with no intent to deceive. While Grievant violated policy by escorting the visitor by holding onto his shoulders, the extent of the struggle was caused by the visitor's effort to return to the ER. The incident could have been much worse -- the visitor was not harmed nor were any patients, staff or others.

At the same time, because Grievant violated policy and did not report the full extent of the incident he is deserving of some punishment. The officer in the case cited by the Union received a five-day suspension. That officer had significantly longer service than Grievant and was remorseful. While Grievant was sincere, acknowledged that he could have done better, and indicated his openness to remedial training, he did not acknowledge that he violated policy or

---

[282]     *City of Country Club Hills v. Charles*, 2020 Ill. App. (1st) 200546.

[283]     *Id.* at ¶13.

[284]     *Id.* at ¶14. The arbitrator did not find that the employer proved an order to report the Club but did find the officer was not truthful in reporting his activities. *Id.*

should have made a more detailed report. While Grievant's service was relatively short before the incident, his two commendations during that short time, one involving a use of force incident, suggest that he could return and have a successful career as a police officer.

I am mindful of the importance of honest police officers, as Illinois courts have recognized and the Employer points out. Yet it is clear that the Employer does not find it essential to terminate all officers who fail to report incidents of force. In the instant case, a significant punishment will emphasize the importance of following protocol and fully reporting in detail incidents of force. Reinstatement without back pay will result in a long suspension that will emphasize to Grievant and others the seriousness of the breach and the magnitude of the failure to include all necessary information regarding use of force in any report.[285] I also believe that, as in the case of the officer who was suspended for five days, Grievant should receive remedial training regarding General Order 108 – Use of Force.

---

[285]     *See Labor Arbitration Decision,* 162247-AAA, [Number redacted], 2010 BNA LA Supp. 162247 (Bluth) (finding reinstatement without back pay would demonstrate the seriousness of the violation to employee who breached the rules and failed to report); *Labor Arbitration Decision,* 162384-AAA, [Number redacted], 2010 BNA LA Supp. 162384 (Shaller) (reinstating without back pay a short-term employee who showed no remorse and did not have a stellar record to emphasize seriousness of the violation and fact that a repetition would warrant termination); *Temple-Inland Paperboard,* 2006 BNA LA Supp. 117915 (finding a long suspension would show the seriousness of the violation).

## VII. <u>AWARD</u>

Based on the record as a whole, and the findings, analysis and discussion set forth above, the undersigned finds that the Employer did not have just cause for termination of Grievant. Some discipline was warranted, however, as the violation was serious despite Grievant's good motives.

Grievant should be reinstated. The time off will be considered a suspension, and he will receive no back pay for the time he was off as a penalty for the violation.[286]

DATED: June 16, 2025

s/s <u>Jules I. Crystal</u>
Jules I. Crystal, Arbitrator

---

[286] The parties agreed at the hearing that should damages be an issue, they would reserve the right to put on evidence regarding damages after the initial decision. Tr. 17-19. While I do not believe that should be necessary in light of my decision that no back pay is due, I will retain jurisdiction for sixty days in the event my involvement is needed for any remedial issues.

# AGREEMENT

Between



## The University of Chicago

and

## Police Benevolent & Protective Association of Illinois, Local 185



## May 1, 2023- April 30, 2027

1



**CONTENTS**

CONTRACTING PARTIES ..................................................................................................................7

ARTICLE 1     PREAMBLE & STATEMENT OF PRINCIPLES .....................................................7
SECTION 1.1.    PREAMBLE ........................................................................................7
SECTION 1.2.    STATEMENT OF PRINCIPLES ...........................................................7

ARTICLE 2     RECOGNITION .............................................................................................7
SECTION 2.1     GENERAL .............................................................................................7
SECTION 2.2.    PART TIME STATUS .......................................................................... 8

ARTICLE 3     UNION SECURITY ....................................................................................... 8
SECTION 3.1     GENERAL ............................................................................................. 8
SECTION 3.2     CHECK-OFF AND FAIR SHARE ......................................................... 9
SECTION 3.3     INDEMNIFICATION ........................................................................... 9

ARTICLE 4     MANAGEMENT'S RIGHTS .......................................................................... 9
SECTION 4.1.    ENUMERATION................................................................................. 9

ARTICLE 5     NO STRIKE – NO LOCKOUT ..................................................................... 10
SECTION 5.1     NO STRIKE......................................................................................... 10
SECTION 5.2     UNION RESPONSE............................................................................ 10
SECTION 5.3     NO LOCKOUT.................................................................................... 10

ARTICLE 6     SUBCONTRACTING ................................................................................... 10

ARTICLE 7     UNION REPRESENTATION ....................................................................... 10
SECTION 7.1     STEWARDS COMMITTEE ................................................................ 10
SECTION 7.2.    UNION ACTIVITY ..............................................................................11
SECTION 7.3.    UNION REPRESENTATIVE VISITATION ...........................................11
SECTION 7.4.    ACCESS TO UNIVERSITY EQUIPMENT ...........................................11
SECTION 7.5.    RELEASE TIME FOR BARGAINING ...................................................11

ARTICLE 8     SENIORITY...................................................................................................11
SECTION 8.1     DEFINITION........................................................................................11
SECTION 8.2     TERMINATION OF SENIORITY ........................................................ 12

ARTICLE 9     POSITION CLASSIFICATION, INITIAL EVALUATION PERIOD, & CERTIFICATION REQUIREMENTS
............................................................................................................. 12
SECTION 9.1.    POLICE OFFICER CLASSIFICATION ................................................ 12
SECTION 9.2.    INITIAL EVALUATION PERIOD ........................................................ 13

SECTION 9.3.    OFFICERS WHO TERMINATE WITHIN THIRTY-SIX MONTHS.............................................13

SECTION 9.4.    NEW JOB CLASSIFICATION(S) ...................................................................................13

**ARTICLE 10    LAYOFF**.................................................................................................................**14**

SECTION 10.1.   EFFECTUATING REDUCTION IN FORCE .......................................................................14

**ARTICLE 11    HOURS OF WORK** ...............................................................................................**14**

SECTION 11.1    PURPOSE ...............................................................................................................14

SECTION 11.2    WORKWEEK...........................................................................................................14

SECTION 11.3.   WORK PERIOD / SCHEDULE, AND WORKDAY ...............................................................14

SECTION 11.4    POSTING OF SCHEDULES AND INDIVIDUAL OFFICER ASSIGNMENTS .............................14

SECTION 11.5.   OVERTIME DEFINITION AND PAYMENTS.......................................................................15

SECTION 11.6.   OVERTIME SCHEDULING...........................................................................................15

SECTION 11.7.   CALL BACK PAY.......................................................................................................16

SECTION 11.8.   PAYMENT FOR COURT TIME ......................................................................................16

**ARTICLE 12    GRIEVANCE PROCEDURE** ....................................................................................**16**

SECTION 12.1    GRIEVANCE DEFINED ...............................................................................................16

SECTION 12.2    GRIEVANCE REQUIREMENTS.....................................................................................16

SECTION 12.3    GRIEVANCE PROCEDURE..........................................................................................17

SECTION 12.4.   DISCIPLINARY GRIEVANCES ......................................................................................18

SECTION 12.5.   UNION RESPONSIBILITY ...........................................................................................18

**ARTICLE 13    WAGES** ................................................................................................................**18**

SECTION 13.1.   JOB CLASSIFICATION SCHEDULE AND MINIMUM RATES OF PAY ..................................18

SECTION 13.2.   WAGE RATE PROGRESSION.......................................................................................18

SECTION 13.3.   GENERAL INCREASES...............................................................................................18

SECTION 13.4.   SHIFT DIFFERENTIAL................................................................................................19

SECTION 13.5.   PAY PERIOD ...........................................................................................................19

SECTION 13.6.   NEW JOB CLASSIFICATION(S) ...................................................................................19

SECTION 13.7.   BONUS ..................................................................................................................19

**ARTICLE 14    LATERAL HIRE** ....................................................................................................**19**

**ARTICLE 15    HOLIDAYS** ...........................................................................................................**20**

SECTION 15.1    AUTHORIZED UNIVERSITY HOLIDAYS .........................................................................20

SECTION 15.2    COMPENSATION FOR HOLIDAYS................................................................................20

SECTION 15.3    ELIGIBILITY REQUIREMENTS.....................................................................................20

SECTION 15.4    HOLIDAYS DURING VACATION...................................................................................21

**ARTICLE 16**     **PERSONAL HOLIDAYS** ................................................................................ **21**

   SECTION 16.1.    PERSONAL HOLIDAYS .................................................................. 21

**ARTICLE 17**     **VACATION** .......................................................................................... **21**

   SECTION 17.1    VACATION ACCRUALS ................................................................. 21

   SECTION 17.2.    VACATION ELIGIBILITY ............................................................... 21

   SECTION 17.3.    VACATION SCHEDULING .............................................................. 22

   SECTION 17.4.    NO EXTENSION OF VACATION ..................................................... 22

   SECTION 17.5.    VACATION PAY .......................................................................... 22

   SECTION 17.6.    VACATION ON TERMINATION ..................................................... 22

   SECTION 17.7.    RESCHEDULING/CANCELING VACATION ...................................... 22

**ARTICLE 18**     **BEREAVEMENT LEAVE** ......................................................................... **23**

   SECTION 18.1.    GENERAL PROVISIONS ................................................................ 23

   SECTION 18.2.    VERIFICATION ........................................................................... 23

**ARTICLE 19**     **LEAVES OF ABSENCE** ........................................................................... **23**

   SECTION 19.1.    PERSONAL LEAVE OF ABSENCE. .................................................. 23

   SECTION 19.2.    MILITARY RESERVE TRAINING .................................................... 23

   SECTION 19.3    MILITARY LEAVE ....................................................................... 23

**ARTICLE 20**     **SICK LEAVE WITH PAY** .......................................................................... **24**

   SECTION 20.1    GENERAL ................................................................................. 24

   SECTION 20.2.    ANNUAL SICK LEAVE ACCRUALS ................................................. 24

   SECTION 20.3.    SICK LEAVE USE WHILE RECEIVING WORKERS COMPENSATION .......... 24

   SECTION 20.4.    PAID SICK LEAVE USE ................................................................ 24

   SECTION 20.5.    USE OF VACATION OR PERSONAL HOLIDAYS FOR ILLNESSES .......... 24

   SECTION 20.6.    SICK LEAVE PAY OUT ON RETIREMENT ....................................... 24

**ARTICLE 21**     **WELLNESS DAYS** ................................................................................. **25**

**ARTICLE 22**     **WORK INCURRED INJURY LEAVE** ............................................................ **25**

   SECTION 22.1    GENERAL PROVISIONS ................................................................ 25

   SECTION 22.2    PAYMENTS. .............................................................................. 25

   SECTION 22.3.    RETURN TO WORK ..................................................................... 26

   SECTION 22.4.    MODIFIED DUTY ....................................................................... 26

**ARTICLE 23**     **DISABILITY** ........................................................................................ **27**

   SECTION 23.1.    GENERAL PROVISIONS ................................................................ 27

   SECTION 23.2.    SHORT TERM DISABILITY PROVISIONS ........................................ 27

**ARTICLE 24**   **RETIREMENT PLAN**............................................................................28
SECTION 24.1.   GENERAL...............................................................................28
SECTION 24.2.   RETIREMENT PLAN PARTICIPATION ....................................28

**ARTICLE 25**   **GROUP HEALTH INSURANCE** ........................................................28

**ARTICLE 26**   **RIGHTS OF OFFICERS UNDER INVESTIGATION / PROVIDNG WITNESS TESTIMONIES** ............28
SECTION 26.1.   DISCIPLINARY INVESTIGATIONS .......................................28
SECTION 26.2.   WITNESS OFFICER'S STATEMENTS IN DISCIPLINARY INVESTIGATIONS ...............................29
SECTION 26.3.   DISCLOSURE ........................................................................29
SECTION 26.4.   OBLIGATION OF ALL OFFICERS. .........................................29

**ARTICLE 27**   **MISCELLANEOUS**.........................................................................29
SECTION 27.1.   OTHER AGREEMENTS .........................................................29
SECTION 27.2.   IDENTIFICATION CARDS......................................................29
SECTION 27.3.   UNIFORMS............................................................................29
SECTION 27.4.   OFFICER RESPONSIBILITY TO PROVIDE ACCURATE INFORMATION ........................30
SECTION 27.5.   OFFICER RESPONSIBILITY TO PROVIDE ACCURATE INFORMATION ........................30
SECTION 27.6.   TUITION REIMBURSEMENT PROGRAM .................................30

**ARTICLE 28**   **LABOR-MANAGEMENT CONFERENCES** ........................................30
SECTION 28.1.   GENERAL...............................................................................30
SECTION 28.2.   AGENDA ...............................................................................30
SECTION 28.3.   PRE-MEETING PREPARATION .............................................30
SECTION 28.4.   SCHEDULING OF CONFERENCES. .......................................30
SECTION 28.5.   MINUTES. ..............................................................................30

**ARTICLE 29**   **BULLETIN BOARDS**.....................................................................30

**ARTICLE 30**   **DRUG AND ALCOHOL POLICY** .....................................................31
SECTION 30.1.   GENERAL...............................................................................31
SECTION 30.2.   USE OF DRUGS AND ALCOHOL. .........................................31
SECTION 30.3.   PRE-EMPLOYMENT SCREENING .........................................31
SECTION 30.4.   PROHIBITION ......................................................................31
SECTION 30.5.   DEFINITIONS........................................................................31
SECTION 30.6   SELECTION OF OFFICERS FOR DRUG AND/OR ALCOHOL TESTING...............................32
SECTION 30.7   TEST PROCEDURES .............................................................32
SECTION 30.8   VOLUNTARY TREATMENT AND COUNSELING .....................33
SECTION 30.9.   CONFIDENTIALITY AND PRIVACY........................................33

SECTION 30.10. CONSEQUENCES OF TESTING POSITIVE, REFUSING TO BE TESTED, DELAY IN BEING TESTED OR TAMPERING WITH TESTS..................................................................................................................33

**ARTICLE 31**      **SEPARABILITY AND SAVINGS**............................................................................................33

**ARTICLE 32**      **NONDISCRIMINATION**.....................................................................................................34

**ARTICLE 33**      **DURATION**.........................................................................................................................34

SECTION 33.1.      TERM OF THE AGREEMENT...............................................................................................34

SECTION 33.2.      TERM OF AGREEMENT DURING NEGOTIATIONS.................................................................34

**SIGNATURE PAGE**..................................................................................................................................35

**APPENDIX A**      **WAGES – MINIMUM RATES**...............................................................................................36

**APPENDIX B**      **REIMBURSEMENT AGREEMENT FOR HIRING AND TRAINING EXPENSES**.............................37

**APPENDIX C**      **ITEMIZED LIST OF UNIFORMS AND EQUIPMENT WITH ESTIMATED COSTS**.........................39

**APPENDIX D**      **PAYCHECK DEDUCTION AGREEMENT**..................................................................................41

**APPENDIX E**      **RETIREMENT INCOME PLAN FOR EMPLOYEES (ERIP) SUMMARY PLAN DOCUMENT**..........42

**APPENDIX F**      **PERSONAL ACCIDENT INSURANCE**......................................................................................43

**LETTER OF UNDERSTANDING - WELLNESS INCENTIVE**..........................................................................44

**LETTER OF UNDERSTANDING – PO5 OFFICERS**.....................................................................................45

**INDEX**................................................................................................................................................46

## CONTRACTING PARTIES

This Agreement made and entered into as of May 1, 2023, by and between the University of Chicago (the "University" or the "Employer") and the Policemen's Benevolent and Protective Association and its Unit #185 (the "Union").

### ARTICLE 1    PREAMBLE & STATEMENT OF PRINCIPLES

SECTION 1.1.    PREAMBLE

A.    The University recognizes the Union's legal responsibility to act as the collective bargaining agent for the Officers covered by this Agreement (referred to interchangeably as "Police Officers or "Officers") and its legal duty to provide fair representation to those Officers.

B.    The Union recognizes the University's responsibilities to manage the Police Department and the University, as a whole, in an efficient, responsible manner.

SECTION 1.2.    STATEMENT OF PRINCIPLES

A.    The University and the Union realize that in order to provide maximum opportunities for continuing employment, job security, good, safe, healthy working conditions and good wages and benefits, the University must provide the highest quality services to the University community and its environs in a timely fashion, and otherwise be able to operate the University economically and competitively to meet the primary mission of the University by providing an excellent education to its students, of creating new knowledge, of being a dedicated member and leader in the local as well as world communities.

    1.    The University and the Union agree to work toward the attainment of these goals and towards the goal of mutual respect and trust for each other. The Union and the University agree to cooperate and support all efforts to assure that Officers provide effort for a full day of work for a fair day's pay, and that they will actively work to avoid absenteeism and any other practices which hurt or interfere with the operation and mission of the University.

    2.    Furthermore, the University and the Union desire to develop the Officers into a skilled, versatile and effective workforce through training and education.

B.    The Union and the University are dedicated to improving police services, providing for a safe environment, preserving equipment, preventing accidents and strengthening goodwill between the University and its Officers, as well as the University's students, faculty, administrators, other employees, affiliates, vendors, visitors and members of the community. The Union and the University further recognize that the University has certain obligations and responsibilities to its students, its faculty, its administrators, its other employees, its vendors, its visitors and the community and therefore the University and the Union agree that they will fully cooperate in the performance and discharge of these obligations and responsibilities.

### ARTICLE 2    RECOGNITION

SECTION 2.1    GENERAL.

A.    Pursuant to the certifications issued by the National Labor Relations Board in Case No. 13-RC-20266, the University of Chicago (hereinafter the University, or the employer, or management) recognizes the Policemen's Benevolent and Protective Association of Illinois #185 (hereinafter the Union) as the exclusive agent for purposes of collective bargaining with respect to wages, hours and conditions of employment for all certified and non-certified Police Officers at the rank of PO3 and PO2 who are:

    1.    full-time Police Officers or except as provided in §2.1.D., below;

    2.    "eligible" part-time Police Officers as defined in §2.2.A., and

       3.      employed by the University at its campus located at and around 5801 South Ellis Avenue, Chicago, Illinois 60637.

B.      All other University of Chicago employees, including supervisors, managers and confidential employees, as defined in the National Labor Relations Act, are excluded from the bargaining unit.

C.      Nothing in this Agreement, including the recognition of the Union as bargaining agent, is intended as guarantee, implicit or implied, that any work currently or subsequently performed at the University will continue to be performed at the University, nor as a guarantee or obligation of employment or that the University will continue its operations or any portion of its operations.

D.      Any non-certified Police Officer (PO2) who does not achieve Illinois Police Officer Certification shall not be eligible to become a member of the bargaining unit.

SECTION 2.2.    PART TIME STATUS.

A.      Part-time Police Officers work a maximum of nine hundred ninety-nine (999) hours in a twelve-month period. Part time Police Officers' work schedules are set by the University in accordance with its operational needs.

B.      For the purposes of §2.1.A., a part-time Police Officer "eligible" for union representation is one who works an average of twenty four (24) hours per month or more during the six month period between either January 1 and June 30, or July 1 and December 31.

C.      The University may terminate the employment status of a part-time Police Officer who has not worked at least an average of twenty-four (24) hours per month during a twelve (12) month period.

       1.      The University will calculate part-time Police Officers' eligibility for union membership and continued employment within thirty (30) calendar days of the end of each six-month period, as provided in §2.2.A., above.

       2.      These calculations are contained in the University's bi-annual reports to the Illinois Law Enforcement Training & Standards Board, which are made pursuant to the Police Training Act.

SECTION 2.3. MUTUAL AID. Nothing will preclude the University of Chicago from engaging in Mutual Aid agreements, responding to Mutual Aid requests, or asking for Mutual Aid assistance as circumstances warrant. When working in a Mutual Aid assignment, Officers will remain covered by the terms of this Agreement.

## ARTICLE 3    UNION SECURITY

SECTION 3.1    GENERAL.

A.      All Police Officers covered by the terms of this Agreement shall as a condition of employment, either become and remain members in good standing of the Union, or pay a fair share fee to the Union. Such membership / fair share fee is due

       1.      on or after the ninety-first (91st) calendar day following the full-time Officer's initial date of employment as an Officer, or,

       2.      on or after the ninety-first (91st) day following the beginning of a part-time Officer's period in which they accrue the requisite number of hours to become part of the bargaining unit, as certified by the University in its bi-annual report to the Illinois Law Enforcement Training & Standards Board pursuant to the Police Training Act.

B.      For the purposes of this Article, the obligation of any Police Officer to become or remain a member of the Union "in good standing" will be met upon the payment, or tender of payment, of the initiation fee and dues uniformly required by the Union as a condition for membership. It is understood and agreed that Union membership obligations and/or activities will in no way interfere with the effective performance of the Police Officer's duties as a member of the University's Police Department.

It is further understood that all Officers, who have not completed their Initial Evaluation Period (IEP), including the period during which Officers are participating in training required to become Certified Officers, will be considered Initial Evaluation Period (IEP) Officers (also referred to as "Probationary Officers") who are "at-will" Officers for termination/discharge purposes.

SECTION 3.2    CHECK-OFF AND FAIR SHARE

A.    Check-off. Once the University receives written authorization from any Officer covered by this Agreement, the University will deduct from their pay Union dues, in amounts designated by the Union in writing. Deductions will be made from the pay of Police Officers for the first pay period in the calendar month unless the amount of pay is insufficient, in which event deductions will be made from later paychecks. Unless expressly authorized by the Union in writing, the deductions will be made payable and forwarded to: PB&PA – Labor, 435 W. Washington, Springfield, Illinois 62702.

B.    Fair Share. During the term of this Agreement, Officers covered by the terms of this Agreement who are not Union members will, commencing thirty (30) days after the start of employment or thirty (30) days after the effective date of this Agreement, whichever is later, pay a fair share fee to the Union for collective bargaining and labor agreement administration services provided by the Union. The University will deduct fair share fees from the earnings of non-members and send the deducted amounts to the Union. The Union will provide the University with a list of members covered by this Agreement who are not members of the Union and an affidavit which specifies the amount of the fair share fee. The fair share fee will not include contributions related to the election or support of any candidate for political office or for any members-only benefit. The Council agrees to assume full responsibility to ensure full compliance with the legal rights of fair share payers.

SECTION 3.3 INDEMNIFICATION. The Union will indemnify and hold the University harmless against any and all claims, demands or other forms of liability, including the cost of defense, which may arise out of, or by reason of, any action taken or not taken by the University for the purpose of complying with any of the provisions of this Article.

## ARTICLE 4    MANAGEMENT' S RIGHTS

SECTION 4.1.    ENUMERATION. The operation, control and management of the Employer's facilities and operations, and all business of the University and activities of the University which are covered or affected by this Agreement, and the supervision and direction of the working forces at the University's facilities, operations and business are and will continue to be solely and exclusively the functions and prerogatives of the management of the Employer. All of the rights, functions and prerogatives of management which the University had before entering into this Agreement with the Union are reserved and retained exclusively to the Employer. In no event will any right, function or prerogative ever be deemed or construed to have been modified, diminished or impaired by any past practice or course of conduct, or otherwise, other than by an explicit provision of this Agreement. Specifically, but without limiting or affecting the generality of the above statements, it is distinctly understood and agreed that this Agreement does not affect and shall not be deemed or construed to impair or limit in any way the Employer's right in its sole discretion and judgment, to determine the nature and extent of the business to be carried on by the University; determine vendors, students and others with whom it will deal, and the prices at which the terms on which its materials, equipment and supplies will be purchased, leased or otherwise acquired and its services will be sold; determine the size and composition of the working force covered by this Agreement, and assignment of work, and policies affecting the selection of employees; establish and enforce quality, reasonable service standards for its employees, services of the University; establish new departments; introduce new and improved equipment, facilities and service methods; establish and change work performance standards; change, combine, establish or discontinue jobs or operations, and determine when and if vacancies in the working force shall be filled; determine the means and methods by which services will be provided; to schedule and determine the hours of operations (including overtime work); to hire, promote, demote, and transfer, to suspend, discipline and discharge for cause; and discontinue temporarily or permanently, in whole or in part, any operations of the University covered or affected by this Agreement.

9

The Employer will also have the right from time to time to make and enforce any reasonable rules applicable to Officers covered by this Agreement, as it may from time to time deem necessary or advisable. Additionally, the Employer may set reasonable appearance and dress standards.

The parties recognize that any management responsibility, prerogative or rights not specifically and clearly limited by the terms of this Agreement are reserved to the management of the University.

### ARTICLE 5    NO STRIKE – NO LOCKOUT

SECTION 5.1 NO STRIKE. During the term of this Agreement or any extension of this Agreement, the grievance procedures of this Agreement, and the administrative and judicial remedies and procedures provided by statute for remedying unfair labor practices, will be the sole and exclusive means of settling any dispute between the Officers and/or the Union and the University, relating to the application of this Agreement. Accordingly, during the term of this Agreement or any extension of it, neither the Union nor any Officers will instigate, promote, sponsor, engage in, or condone any strike, sympathy strike, slowdown, concerted stoppage of work, observance of picket lines, or any other intentional interruption of, curtailment of, restriction of, or interference with the University's functions or operations, regardless of the reason.

SECTION 5.2    UNION RESPONSE.  Should any activity proscribed by Section 5.1 occur, the Union will immediately:

A.    publicly disavow the action by the Officers or other persons involved;

B.    advise the University in writing that the action has not been caused or sanctioned by the Union;

C.    post notices on Union bulletin boards stating that it disapproves of the action and instructing all Officers to cease the action and return to work immediately, and

D.    take such other steps as are reasonably appropriate to ensure compliance with the provisions of this Section.

The University will have the right to discharge or otherwise discipline any or all Officers who violate any of the provisions of this Section, and in the event a grievance is filed, the sole question to be resolved in the grievance procedure and arbitration will be whether the Officer or Officers participated in the action prohibited by this Section. If it is determined that an Officer did participate, the disciplinary action taken by the University may not be disturbed.

SECTION 5.3    NO LOCKOUT. The University agrees that it will not lock out its Officers during the term of this Agreement or any extension of it.

### ARTICLE 6    SUBCONTRACTING

The University agrees not to subcontract work where it would result in the layoff of bargaining unit Officers without first giving the Union notice and affording the Union the opportunity to bargain. The parties agree that full consideration and weight will be given to economic savings and the University's institutional needs. The University will not subcontract for the purpose of avoiding the terms and conditions of this Agreement.

### ARTICLE 7    UNION REPRESENTATION

SECTION 7.1    STEWARDS COMMITTEE.

A.    The University recognizes and will deal with stewards for the Union as set forth in this Article. The University will recognize eight (8) stewards from the Police Officers covered by this Agreement. All Stewards must have completed their initial evaluation period, and at least one year of full time Certified Police Officer status with the University.

B.    The Union will advise the University in writing of the names of its designated stewards by January 30 of each year.

10

In the event stewards change during the calendar year, the Union will notify the University of such changes within thirty (30) calendar days. Such Notification shall be made to the University of Chicago Assistant Vice President, Human Resources. No Police Officer will be recognized as a Steward unless and until the University is advised.

SECTION 7.2.    UNION ACTIVITY.

A.    Stewards will not leave their work assignments/areas or stop working without prior permission of their direct supervisor (indicating grievance and destination concerned). Permission shall not arbitrarily or unreasonably be withheld. Pursuant to the provisions of Article 5 of this Agreement, the Steward shall have no authority to instigate or take strike action, or any other action interrupting the University's activities. In the event of any strike activity(ies), the University will have the authority to impose proper discipline, including discharge.

B.    If the Chief or their designee calls an Officer to a meeting where disciplinary action may be taken, a Union Steward will be present, provided the Officer requests a Steward. Normally, the Steward from the Officer's watch will attend the meeting. If this Steward is not available, the Chief, or their designee, will notify another Steward of the meeting and permit them to attend. If a Steward is not available in a reasonable amount of time, the University may issue the disciplinary action without a Steward present.

SECTION 7.3. UNION REPRESENTATIVE VISITATION.  An authorized non-employee Union representative may visit the University property for purposes of administering this Agreement. If the representative wants to visit any of the University's facilities, where Officers covered by this Agreement are working, they must first contact the Assistant Vice President, Human Resources or their designee, and the designee of the Police Chief and identify the facility they intend to visit. Such information must be provided in a reasonable time in advance of their visit.

SECTION 7.4. ACCESS TO UNIVERSITY EQUIPMENT. Designated Union Stewards will have reasonable access to University facilities and equipment to receive and send official union materials via the US Mail, and the use of the copying machine and work computers for the processing of grievances. University equipment shall not be used for union organizing or public relations purposes. The Union will hold the University harmless for the misdirection of any Union mail.

SECTION 7.5.    RELEASE TIME FOR BARGAINING. The University will provide paid release time at the Officers' regular straight time rate for up to four (4) members of the Union's negotiation committee for time spent in negotiating sessions with the University.  A negotiation session is defined as scheduled meetings and related caucuses during meeting days on which contract negotiations occur. Pay for time spent in negotiations shall not count in the calculation of overtime or other premium pay.

## ARTICLE 8    SENIORITY

SECTION 8.1    DEFINITION.

A.    For the purposes of this Article, and provisions in the Agreement that specifically use the term seniority, "seniority" is defined as an Officer's total length of active service in a bargaining unit position as defined in §2.1., dating from the Officer's date of hire in the bargaining unit, except as provided in §8.1.B., below. In the event two Officers are hired on the same date, the Officer with the earlier birth date will have the higher seniority.

B.    With the exception of "Line of Duty" Workers Compensation status, time in inactive status (Layoff, Leave of Absence, Short Term Disability, Long Term Disability, or Workers Compensation status) for a full pay period or longer, does not count in the calculation of an Officer's seniority.

C.    In the event a Police Officer is placed in a non-bargaining unit Certified Officer position within the University of Chicago Police Department, their seniority in the unit will be suspended starting with the first day of work in the non-unit position.

If the individual returns to the bargaining unit directly from a Certified position in the UC Police Department, their prior seniority will be reinstated and all new active service as a bargaining unit Police Officer will be added to it. The returning Officer's vacation calculations will be based on total active University service, and their salary will be set in accordance with the provisions of Article 13, Wages.

SECTION 8.2   TERMINATION OF SENIORITY.   An Officer's seniority and their employment relationship with the University terminates on the occurrence of any of the following events:

A.      resignation;

B.      retirement;

C.      discharge;

D.      absence for two (2) consecutive workdays without notification to the shift supervisor of the reason for the absence, or violation of department call-in procedures during such period;

E.      failure to return to work from layoff within five (5) days after receiving notice of recall and failure to notify the University within three (3) days after receiving notice of recall of their intention to return to work;

F.      failure to report for work at the conclusion of a leave of absence or vacation;

G.      indefinite lay-off;

H.      an absence because of illness or non-Line of Duty injury for a period of twelve (12) months, or the length of their seniority, whichever is less; or

I.      being employed while on an authorized leave of absence.

### ARTICLE 9     POSITION CLASSIFICATION, INITIAL EVALUATION PERIOD, & CERTIFICATION REQUIREMENTS,

SECTION 9.1.  POLICE OFFICER CLASSIFICATION.  All Officers, after achieving state certification, will be classified as PO3.  Police officers will be categorized as either POII or POIII in accordance with this agreement. Any reference to prior classifications, such as "Permanent PO5", are hereby eliminated.

1. Any Certified Police Officer who does not maintain their Illinois Police Officer Certification shall be terminated

B. PO2 POLICE OFFICERS (NON-CERTIFIED). A successful candidate who is not a certified Police Officer will be employed as a PO2 Police Officer until they complete the training required by the State of Illinois and obtain their Police Officer Certification.  Officers in this classification are employed at will and may be terminated at any time, with or without cause, and without recourse to the grievance procedure.

1. Time worked to complete required training to become a certified Police Officer does not count toward the completion of the Initial Evaluation Period.

2. PO2 Police Officers who successfully complete the requisite training and obtain certification will be promoted to PO3 Police Officer effective the beginning of the first pay period following completion of all required State of Illinois and UCPD certification requirements.

C. Field Training Officers. Field Training Officers (FTOs) assigned to patrol services will receive an annual one-time stipend of $6,500, less applicable taxes and withholdings, effective July 1 of each year of the collective bargaining agreement. The stipend will be paid the first full pay period in July. This stipend will be pro-rated by pay period for assuming the duties of an FTO.

1. Officers will be selected as an FTO at the discretion of the University.

12

2. The University, in its discretion, will determine when there is a need to assign a Police Officer as an FTO. When making the assignment, the University will consider Police Officers who have filed a letter of interest, and will inform the selected Officer of the assignment's approximate duration.

D.     Power Car.   Officers who receive the Power Car assignment will receive an annual one-time stipend of $1,500, less applicable taxes and withholdings, effective July 1 of each year of the collective bargaining agreement. The stipend will be paid the first full pay period in July. The stipend will be prorated by pay period for assuming the position of power car.

1. Officers will be selected for the Power Car assignment at the discretion of the University.

2. The University, in its discretion, will determine when there is a need to assign a Police Officer to a Power Car. When making the assignment, the University will consider Police Officers who have filed a letter of interest and will inform the selected Officer of the assignment's approximate duration.

SECTION 9.2.   INITIAL EVALUATION PERIOD

A.     All Certified Police Officers shall serve an Initial Evaluation Period (IEP) of twelve (12) months of continuous service at one-half time or more without a break in service following their date of initial employment in the bargaining unit as a PO3.

B.     The University may discharge or otherwise discipline, lay off, transfer or assign Officers during their Initial Evaluation Period, with or without cause at the sole discretion of the University. The University's exercise of its discretion with respect to Officers is not subject to review by any means, including the University's internal complaint procedure or the Agreement's Grievance/Arbitration Procedure.

C.     OFFICERS WHO ARE REHIRED FOLLOWING A BREAK IN SERVICE DURING THE IEP, including a break in service due to failure to complete the training required to become a Certified Police Officer, shall serve a new IEP. The cost of retaking training to become a Certified Police Officer will be borne by the Officer.

SECTION 9.3.   OFFICERS WHO TERMINATE WITHIN THIRTY-SIX MONTHS.

A.     In the event a PO2 Officer terminates employment within thirty-six months following completion of the training at the Chicago Police Department's Education and Training Division Basic Metropolitan Recruit Program (or another police academy), such Officer shall repay the University for one hundred percent (100%) of the cost of the training, uniform, and equipment costs and/or additional expenses by the UCPD, pursuant to the Agreement in Appendix B.

B.     In the event a PO3 Officer terminates employment within thirty-six months following initial employment, such Officer shall repay the University for 100% of the cost of the uniform, and equipment costs and/or additional expenses by the UCPD, pursuant to the Agreement in Appendix C.

SECTION 9.4. NEW JOB CLASSIFICATION(S). If the University establishes a new Police Officer classification, it will set an initial pay rate for the job and will notify the Union of the new classification and pay rate. If the Union challenges the pay rate for the new classification, it will negotiate the pay rate with the University. If no agreement is reached concerning the appropriate rate of pay, the Union may challenge the rate established by the University through the grievance and arbitration procedure provided in Article 12 of the Agreement; and in such case, the question before the arbitrator will be whether the rate established by the University bears a proper relationship to the rates prescribed by this Agreement for other classifications within the bargaining unit.

## ARTICLE 10   LAYOFF

SECTION 10.1. EFFECTUATING REDUCTION IN FORCE.

A.      In effectuating reductions in force within the bargaining unit, the University will consider Officers' ability, skill, disciplinary record, performance record, training record, and qualifications to satisfactorily perform the work.

B.      Where two or more Officers have equal ability, skill, disciplinary record, performance record and equal qualifications to satisfactorily perform a particular job, the Officer with the least seniority will be laid off.

C.      Officers in Layoff status will be placed on a Recall List for two (2) calendar years from the date of Layoff.

When vacant positions are available for filling, laid-off Officers will be recalled to active status in order of Seniority, with the most senior Officer recalled first. In the event a laid off Officer(s) refuses the University's recall to work, the Officer(s) will be dropped from the Recall list, and the position may be otherwise filled.

## ARTICLE 11   HOURS OF WORK

SECTION 11.1   PURPOSE. This Article is intended only to provide a basis for calculating straight-time, overtime and premium payments. There shall be no pyramiding of overtime or premium payments, nor shall same be paid under more than one (1) provision of this Agreement for the same hours worked.

SECTION 11.2   WORKWEEK. The workweek for payroll purposes is a period consisting of seven (7) consecutive days, commencing at 0001 Sunday and end at 2400 the following Saturday.

SECTION 11.3. WORK PERIOD / SCHEDULE, AND WORKDAY

A.      The Work Schedule is the normal hours of work for Officers within a two (2)-week period. Officers will be scheduled in accordance with the needs of the University, subject to the provisions of this Article.

B.      Full -time work schedules include:

      1.      Twelve (12) hours per day, including meal periods, on seven separate days within a two (2) week period, for a total of eighty-four (84) hours;

      2.      Ten (10) hours per day, including meal periods, on eight (8) separate days within a two (2) week period, for a total of eighty (80) hours; and

      3.      Eight (8) hours per day, including meal periods, on ten (10) separate days within a two (2) week period, for a total of eighty (80) hours.

C.      The University may establish part time schedules as needed.

D.      In the event the University decides to eliminate 12-hour work schedules, the University will provide the Union a minimum of 120 days advance notice and, if the Union requests, will negotiate over the effects on wages and benefits of the elimination of 12-hour work schedules.

SECTION 11.4   POSTING OF SCHEDULES AND INDIVIDUAL OFFICER ASSIGNMENTS

A.      ANNUAL SQUADRON WORK SCHEDULES

      1.      Annual squadron schedules shall be accessible to all Officers, posted on a bulletin board or electronically.  The annual schedule shall be posted by no later than December 1 of the preceding year.

      2.      SQUADRON ASSIGNMENTS. The University will determine the number of officers and combination of experience and skills needed for each squad, provided that four (4) positions on each squad will be

14

filled by bids from the most senior officers bidding for the Squad. If the University increases the number of squads from the current four squads to five or more squads, at least three (3) positions on each squad will be filled by bids from the most senior officers bidding for the Squad.

    a.    By no later than May 1 of each year, Officers will submit a bid on a form provided by the University indicating their first, second and third preference for the squad they desire to work. The form will be made available to Officers by no later than April 1 of each year.

    b.    In making squadron assignments, the University will consider the submitted Officer preferences, the skills and experience needed for each squad, and the Officers' seniority. The University will post the squadron assignments by no later than June 1 of each year, with all assignment effective the first pay period in July.

    c.    Officers will remain on the squad for one year. When a vacancy is created, it will be filled by the University until the bidding process for the following year is conducted. The University will endeavor to fill such vacancies based on seniority and prior bids while taking into consideration the experience and skills needed for each squad.

B.    INDIVIDUAL OFFICER WORK ASSIGNMENTS shall be posted at least two (2) weeks in advance of the beginning of the schedule, with the exception that the University may, at its discretion, vary the shift and squad assignments of Officers in their first ninety (90) days of employment.

C.    POLICE OFFICER RESPONSIBILITY. Each Police Officer is responsible for ensuring that they know when they are scheduled to work. Each Officer must stay in contact with the University Police Department's Supervisor.

D.    MUTUAL ASSIGNMENT CHANGES. Following approval of the supervisor, full-time Police Officers may mutually agree to swap watch assignments during a two (2)-week pay period. The Officers involved must promptly notify the Supervisor of the change. Part-time Police Officers may mutually agree to swap watch assignments with other part-time Police Officers who are scheduled during the four-week scheduling cycle. Part-time Police Officers may not swap watch assignments with full-time Police Officers or with part-time Police Officers who are not already scheduled for a watch. The part-time Police Officers who agree to swap watches must promptly notify the Supervisor of the change.

SECTION 11.5. OVERTIME DEFINITION AND PAYMENTS. Overtime is defined as time worked in excess of forty (40) hours in a workweek or in excess of their daily full-time work schedule, as defined in §11.3.B. Hours paid but not worked (e.g., sick time, vacation time, holiday time) will not be counted in the calculation of overtime.

A.    The University will pay Police Officers time and one-half (1 ½) of their straight-time hourly rate for overtime worked. To receive overtime pay, Officers must meet the overtime eligibility requirements as set forth in §11.5.

B.    In the event Officers work overtime outside of their normal scheduled work hours at an event paid for by another University of Chicago entity (i.e., special event overtime), Officers will be paid time and one-half (1 ½ x) their regular straight time rate of pay for all hours worked, or three (3) hours pay, whichever is greater.

SECTION 11.6. OVERTIME SCHEDULING.

A.    When the need for overtime assignments occurs, the University will call for volunteers as soon as practicable after the need for overtime is known by posting a notice and by sending an electronic communication to all Officers.

B.    Overtime will be assigned to the first Officer(s) having the necessary skills who respond(s) to the call for overtime volunteers.

    1.    In the event an officer volunteering for overtime has already worked two overtime assignments in the

pay period, the University will give the assignment to the next officer volunteering, unless the need to fill the overtime assignment is immediate, or the need cannot be met with volunters.

2.   In the event overtime needs cannot be met with volunteers, the University will assign overtime to the least senior available Officer having the necessary skills. The process will be executed on a rotating basis, from the least senior to the most senior officer.

C.   To the extent practical, the University will equalize overtime opportunities among officers working the same squad assignments.

SECTION 11.7. CALL BACK PAY

A.   Officers who are required to return to work due to a failure to perform a portion of their duties are not eligible for call-back pay.

B.   An Officer, except an Officer covered by §11.7.A., who the University calls back to work within four (4) hours after they have completed their assigned watch and has departed the University, will be paid their appropriate rate of pay for a minimum of four (4) hours or for the actual hours worked, whichever is greater.

SECTION 11.8. PAYMENT FOR COURT TIME. A minimum of three (3) hours will be paid to Police Officers who are required to make court appearances outside of their regular work hours. Officers who are scheduled off for vacation, or any Leave of Absence, are not expected to make a court appearance and will not be paid. However, Officers who have been mandated to appear will be paid for such court time.

## ARTICLE 12   GRIEVANCE PROCEDURE

SECTION 12.1 GRIEVANCE DEFINED. A grievance is defined as a written claim by an Officer, a group of Officers, or by the Union against the University alleging a misapplication of a specific provision / specific provisions of this Agreement during the term of the Agreement. An aggrieved Officer / the Union representative may choose to attempt to resolve a dispute through discussion with the Supervisor. However, such discussions shall not extend the deadline for official filing.

A.   Prior to filing a written grievance.

B.   Any resolution or settlement reached at this step will be without precedent. If no resolution occurs at this informal step, and the Officer desires to file a grievance, they will follow the procedures below.

SECTION 12.2 GRIEVANCE REQUIREMENTS. Grievances will be processed in accordance with the procedure specified here.

A.   Grievance Submissions.

1.   All grievances shall be filed on a form mutually agreed to by the parties. All grievances shall contain a clear statement of the issue, the specific provision(s) of the Agreement violated, the names of the Officer(s) affected, the date of the alleged action, and the specific relief sought. A grievance not filed in accordance with the requirements listed above will be considered waived, and ineligible for further processing.

2.   All grievances must be submitted to the individual / University representative designated in each step of the procedure.

B.   Grievance Discussions. Discussions at all steps of this process will take place at a place and time mutually agreed to by the Union and the University.

C.   Time Limits.

1.   A grievance must be filed and appealed within the time limits set forth above, unless extended by written agreement of the parties prior to date on which a deadline occurs, or the grievance will be considered abandoned or settled on the basis of the last position taken by the University. In the event that the University does not answer a grievance within the time limits specified in the grievance

16

       procedure, the grievance will automatically go to the next step without a formal appeal by the Union. A written answer by the University, however, will be submitted prior to discussion of the next step.

2.     The term "working day" as used in this Article means calendar days exclusive of Saturday, Sunday and holidays.

SECTION 12.3 GRIEVANCE PROCEDURE. Grievances will be handled in the following manner:

A.     Step 1.

     1.     A grievance must be filed within seven (7) calendar days after the occurrence of the event giving rise to the grievance. Such grievance shall be filed with the University's Police Department Chief or their designee, with a copy to the Union. If not filed within seven (7) calendar days, the grievance will be deemed abandoned.

     2.     Within ten (10) working days after the filing of the grievance, the Chief or designee, the Union representative and the aggrieved Officer shall meet to attempt to resolve the matter.

     3.     The Chief or designee will provide a written answer to the Union within ten (10) working days of the Step 1 meeting.

B.     Step 2.

     1.     If the grievance is not settled during Step 1, the Union may appeal the grievance to the University's Assistant Vice President, Human Resources or their designee within ten (10) working days after the Step 1 answer was provided.

     2.     The Union shall set forth in writing the factual or other reason(s) for the appeal.

     3.     Within ten (10) working days after receiving the Step 2 appeal, the University's Assistant Vice President, Human Resources or their designee will meet with the Union's Staff Representative and the aggrieved Officer to discuss and attempt to resolve the grievance.

     4.     The University's Assistant Vice President, Human Resources or their designee will provide a written determination within ten (10) working days of the Step 2 meeting.

C.     Step 3: Arbitration.     If the grievance is not resolved at Step 2, the Union may appeal the grievance to arbitration by giving the Assistant Vice President, Human Resources or their designee written notice within fifteen
(15) working days of the Step 2 written response. This notice will contain the factual or other reason(s) for the appeal to arbitration. If the grievance is not submitted to arbitration within the fifteen (15) working days, the grievance shall be considered settled based on the Step 2 response.

     1.     After the Union appeals the grievance to arbitration, the Union and the University will attempt to select an arbitrator. If the parties are unable to agree on an arbitrator within fourteen (14) calendar days after the Union has given written notice as described above, the parties will request the Federal Mediation and Conciliation Service to submit a list of seven (7) arbitrators, who are members of the National Academy of Arbitrators and who are from the Chicago metropolitan area. The parties will begin the selection procedure within fourteen (14) calendar days after the receipt of the panel from the Federal Mediation and Conciliation Service. The party requesting the arbitration will strike the first name from the list and the parties will strike names alternatively after that. The person whose name remains will be the arbitrator. Either party, before striking any names, will have the right to reject one (1) panel of arbitrators. The arbitrator will be notified of their selection by a joint letter from the University and the Union requesting that they set a time and place for the hearing, subject to availability of the University and Union representatives.

     2.     Not more than one (1) grievance may be submitted to or be under review by any one arbitrator at any one time unless the parties agree otherwise.

     3.     The arbitrator's decision will be final and binding on the University, the Union and the aggrieved

Officer(s). The arbitrator may consider and decide only the particular grievance presented and their decision shall be based only on an application or interpretation of the provisions of this Agreement. The arbitrator will have no authority to alter, modify, amend, add to or subtract from the provisions of this Agreement.

4. The fee and expenses of the arbitrator shall be divided equally between the parties. The parties will bear their own expenses in preparing for and presenting their positions to the arbitrator.

5. In no event shall an award be retroactive beyond thirty (30) calendar days prior to the date the grievance was first presented in writing.

SECTION 12.4. DISCIPLINARY GRIEVANCES.

A. Any disciplinary action against any Officer will be subject to the grievance procedure, including arbitration. Officers suspended or discharged must demand a hearing within three (3) working days after the notice of discharge or suspension, or the grievance shall be deemed abandoned. The grievance will be initiated at Step 2 of the grievance procedure.

B. If back pay is ordered, interim earnings will be set off against the total amount of back pay due.

Interim earnings will include unemployment compensation benefits and any other monies received during the period covered by the claim; provided, however, those earnings that would have been received, had active employment at the University been continuous, will not be allowed as a set-off against any back pay ordered. In the case of a discharge, the Officer has the duty to mitigate the amount of their back pay.

SECTION 12.5. UNION RESPONSIBILITY. The Union may process, adjust or settle any grievance at any step of the grievance procedure.

## ARTICLE 13    WAGES

SECTION 13.1. JOB CLASSIFICATION SCHEDULE AND MINIMUM RATES OF PAY.    The job classifications and the minimum hourly rates of pay for each classification throughout the length of this Agreement are listed in Appendix A.

SECTION 13.2. WAGE RATE PROGRESSION.    If an Officer's rate of pay is below the minimum rate for their job classification, they will receive a rate adjustment to the scale minimum.

SECTION 13.3. GENERAL INCREASES.

A. Effective the first day of the first full pay period in July 2023 all Officers will receive a 2.5% increase to their regular hourly rate of pay.

B. Effective the first full pay period in July 2024 all Officers will receive a 2.5% increase to their regular hourly rate of pay.

C. Effective the first full pay period in July 2025 all Officers will receive a 2.5% increase to their regular hourly rate of pay.

D. Effective the first full pay period in July 2026 all Officers will receive a 2.5% increase to their regular hourly rate of pay.

SECTION 13.4. SHIFT DIFFERENTIAL. Beginning in the first full pay period in July 2023, full-time Officers whose regular duty shift begins between 4 pm and 5 am will receive a shift differential of one dollar and seventy five cents ($1.75) per hour.

SECTION 13.5. PAY PERIOD. All Police Officers covered by this Agreement shall be paid in full, biweekly, on regular paydays. Police Officers shall be paid not later than ten (10) days after completion of the biweekly period.

SECTION 13.6. NEW JOB CLASSIFICATION(S). If the University establishes a new classification in the bargaining unit, it will set an initial pay rate for the job and will notify the Union of the new job and pay rate. If the Union challenges the pay rate for the new job, it will negotiate the pay rate with the University. If no agreement is reached concerning the appropriate rate of pay, the Union may challenge the rate established by the University through the grievance and arbitration procedure provided in Article 12 of the Agreement; and in such case, the question before the arbitrator will be whether the rate established by the University bears a proper relationship to the rates prescribed by this Agreement for other classifications within the bargaining unit.

SECTION 13.7. BONUS. The University, in its discretion, may institute a program to award bonuses to Officers who have demonstrated outstanding performance during a period of time. Prior to instituting a bonus program, the University will notify the Union of the bonus program in a timely manner and the criteria which the University will use to award a bonus. If the University awards bonuses to bargaining unit Officers in the future, the University will notify the Union of the name of the Officer(s) and the amount(s) of the bonus(s) awarded.

### ARTICLE 14 LATERAL HIRE

In order to attract and recruit qualified and experienced applicants, new employees with at least one (1) year of continuous, full-time law enforcement experience within the past three (3) years may be paid at a level above the normal starting salary commensurate with: (1) the applicant's years of experience as a certified law enforcement officer; (2) the applicant's current base salary; and (3) the state that issued the applicant's law enforcement certification. The applicant will remain at the same pay level/step for at least one (1) year. In all other respects, applicants eligible for hire under this section will be treated as a new hire without prior experience. These applicants will not receive any additional credit in computing seniority, vacation time, etc. These applicants will be considered probationary appointees for twelve (12) months from the date of hire. Officers who require recertification with the Illinois Law Enforcement Training and Standards Board (ILETSB) will be hired in at the entry level PO3 rate until their recertification is granted by the state of Illinois.

The University will recognize up to five (5) years of experience for qualified applicants. For example, if an officer has 10 years of experience, in accordance with the requirements above, the officer will be placed on Step 5. The lateral hire wage scale below reflects wages from July 2023 and changes annually to correspond with the annual increases associated with the general wage scale. Please refer to Appendix A for the corresponding placement on the scale.

| Years of Experience | Step | Wage |
|---|---|---|
| 1 | 1 | $40.62 |
| 2 | 2 | $43.68 |
| 3 | 3 | $45.82 |
| 4 | 4 | $47.97 |
| 5 | 5 | $50.23 |

## ARTICLE 15   HOLIDAYS

SECTION 15.1 AUTHORIZED UNIVERSITY HOLIDAYS.

A.   The following are Authorized University holidays for eligible Officers: (1) New Year's Day; (2) Martin Luther King Jr. Day; (3) Memorial Day; (4) Juneteenth; (5) Independence Day; (6) Labor Day; (7) Thanksgiving Day; (8) Friday after Thanksgiving; and (9) Christmas Day.

B.   When an Authorized University Holiday falls on a Saturday, the preceding Friday will be considered the Authorized University Holiday. When the regular holiday falls on a Sunday, the following Monday will be considered the Authorized University Holiday.

SECTION 15.2 COMPENSATION FOR HOLIDAYS

A.   Holidays Not Worked.

   1.   Pay for holidays not worked (Holiday Pay) does not count in the calculation for overtime.

   2.   For each Authorized University holiday that falls on an Officer's scheduled day off and is not worked, the Police Officer will receive holiday pay for eight (8) hours at their regular straight time rate. The sole exception is a holiday that falls during approved vacation days of at least one week; in such instance, the Officer will receive twelve (12) hours of holiday pay.

   3.   When an Officer's scheduled workday begins on an authorized University holiday and the Department authorizes her/him to voluntarily recognize the holiday as a day off, the Officer will receive holiday pay for the day. If the Officer's regular shift exceeds eight (8) hours, the Officer will receive a Holiday Supplement at their straight time rate for the difference between the holiday pay and the additional hours in their shift.

   4.   An Officer who is scheduled to work on a holiday and who fails to report and work as scheduled will receive no holiday pay.

B.   Holidays Worked.

   1.   When an Officer's work schedule begins on an Authorized Holiday, they will receive time and one-half times (1 ½ x) their regular rate of pay for all hours worked. Officers whose work schedule begins on a day other than the Authorized Holiday will receive straight time pay for all hours worked on the Authorized Holiday.

   2.   In addition to the pay received for hours worked, the Officer shall receive eight (8) hours of holiday pay at their straight time rate.

SECTION 15.3 ELIGIBILITY REQUIREMENTS. To be eligible for holiday pay, a Police Officer must:

A.   be in active status (not be on a Layoff, Leave of Absence, on Short Term Disability, Long Term Disability, or Workers Compensation status -- with the sole exception of Line of Duty Workers Compensation status)

B.   be benefits-eligible;

C.   have been in pay status the last scheduled working day before and the first scheduled working day after the holiday;

D.   if laid off during the week in which a holiday falls, work any scheduled workday during the workweek in which the holiday falls.

20

SECTION 15.4 HOLIDAYS DURING VACATION. If a holiday falls during an Officer's vacation, they will receive holiday pay, provided they work their complete scheduled workdays before and after their vacation.

## ARTICLE 16   PERSONAL HOLIDAYS

SECTION 16.1. PERSONAL HOLIDAYS. In addition to the Authorized University holidays, Officers in active status shall accrue two (2) Personal Holidays on January 1, and one (1) Personal Holiday on April 1, July 1, and September 1 of each calendar year. Officers in inactive status (Layoff, Leave of Absence, on Short Term Disability, Long Term Disability, or Workers Compensation status -- with the sole exception of Line of Duty Workers Compensation status;) on any of the foregoing dates shall not accrue the personal holiday for that date. Officers must be in active status to use and/or receive payment for personal holidays.

A.   An Officer must complete three (3) months of service before they can use an accrued personal holiday. Personal holidays must be used within the same calendar year in which they are accrued and cannot be carried over into the next calendar year. Personal holidays may be taken on days chosen by the Officer, provided the request is in accordance with departmental procedures for requesting time off and provided the absence will not unduly hamper departmental operations.

B.   Eligible Officers will be entitled to payment in lieu of a day off only if the department is unable to schedule time off before the year's end and the Officer's request was made in accordance with departmental procedures for requesting time off. Personal holiday hours paid are not computed as hours worked in determining overtime for the workweek.

C.   Upon termination of employment, eligible Officers will be paid for any unused personal holidays accrued within the calendar year of employment.

## ARTICLE 17   VACATION

SECTION 17.1 VACATION ACCRUALS.

A.   Full-time Officers in active status (not on Layoff, Leave of Absence, on Short Term Disability, Long Term Disability, or Workers Compensation status -- with the sole exception of Line of Duty Workers Compensation status) who work at least fifty percent (50%) of the scheduled hours in the month accrue vacation credit in accordance with the amounts listed below.

1.   For purposes of this calculation, vacation, holidays, funeral leave, and jury duty will be considered days worked.

| YEARS OF SERVICE | AMOUNT OF VACATION |
|---|---|
| 0-8 | 10 Hours / month |
| 9-20 | 13 Hours and 20 minutes / month |
| 21 and above | 16 Hours and 40 minutes / month[2] |

B.   Carry Over of Vacation. Officers may carry over earned but unused vacation from one year to the next, however, the maximum any Officer may accrue is one and one-half times (1.5x) their annual accrual. When an Officer's accrual meets the maximum accrual rate, they will cease accruing vacation time until the Officer's accrual rate falls below the accrual maximum.

SECTION 17.2. VACATION ELIGIBILITY.   Officers are eligible to use accumulated vacation after completing three (3) calendar months of full-time work. Any form of paid or unpaid leave (including sick time, vacation time, bereavement leave and jury duty, and workers compensation), is not considered time worked for the purpose of establishing eligibility to begin using vacation time. The University will determine when Officers may take their vacation.

SECTION 17.3. VACATION SCHEDULING.

A.  The University will approve vacation requests in accordance with operational need, and will not unreasonably deny requests made in accordance with §17.3.B.1, below.

   1.  The University may designate periods during the year when no Police Officer may be on vacation and may also designate the number of Police Officers in each classification who may be on vacation at the same time.

   2.  Vacation approvals will be made on a first-come, first-serve basis. However, in the event an officer received a premium day off in the preceding year, their request need not receive priority consideration.

B.  Officers may not use vacation time before it is accrued.

   1.  Officers may request the use of accrued vacation time between one hundred and eighty (180) and fifteen (15) calendar days in advance of the date(s) on which they intend to use the vacation. However, an Officer may, 365 days in advance, submit one (1) vacation request in each calendar year. In the event two (2) or more Officers on the same squad submit, on the same day, a request for vacation to be taken on the same day(s), the Officer with the greater seniority will be given preference.

   2.  No Officer may take, at any one time, more vacation time off than they annually accrue, even if the total number of accrued hours exceeds this amount.

   3.  Once an Officer has requested and been approved for vacation, they may change the requested vacation dates with the University's approval.

   4.  Requests for vacation time off not meeting the notice requirements in §17.3.B.1, must be made directly with the Officer's supervisor.

SECTION 17.4. NO EXTENSION OF VACATION. No Officer will extend their vacation beyond their scheduled time, unless granted approval for the additional time by the University. Violation of this rule may result in termination of employment.

SECTION 17.5. VACATION PAY.

A.  Full-time Officers will receive vacation pay equivalent to the number of hours in the workday(s) that the Officer took as vacation, at their regular base rate of pay, including shift differential. Bonuses or other variable pay are not included in the calculation of vacation pay.

B.  If an authorized University holiday falls within an eligible Officer's vacation period, the day shall be counted as a holiday rather than a vacation day.

SECTION 17.6. VACATION ON TERMINATION. Eligible Officers who have completed three (3) calendar months of full-time work shall be paid for any accrued and unused vacation upon termination of employment.

SECTION 17.7. RESCHEDULING/CANCELING VACATION. The University may, in emergencies, order an Officer to give up all or any part of vacation, but if it does so the University will pay the Officer the vacation allowance in addition to the standard compensation earned by working during said the missed vacation period or may reschedule the vacation by mutual agreement of the University and the Officer.

---

[2] Officers who have twenty one (21) years' service as of January 1, 2013, will retain the accrual rate of 204 hours/year.

## ARTICLE 18    BEREAVEMENT LEAVE

SECTION 18.1. GENERAL PROVISIONS.

A.    Full-time benefits-eligible Officers are entitled to bereavement leave in the same amounts and subject to the same policies as other University personnel. For benefits-eligible Officers, bereavement leave of up to 5 workdays, or 20 work days in the event of the death of a Child or Spouse, will be paid and will not be deducted from the employee's allotment of sick leave, vacation days, or personal holidays. In the case of paid bereavement leaves, the employee will be paid only for those days that fall on their regularly scheduled workdays. Bereavement leave for non-benefits eligible Officers is generally unpaid; however, such Officers may (but are not required to) use accrued sick leave during a bereavement leave. The University reserves the right to request verification of relationship, death, and attendance at funeral services before granting bereavement leave.

   1.    In the event of the death of an employee's Child or Spouse (as defined by Policy), the employee may take up to 20 workdays (four work weeks) of bereavement leave if requested.  Bereavement leave for the death of a Child or Spouse need not be taken on consecutive workdays, but must be taken within one year of the death.

   2.    In the event of the death of an employee's parent or foster parent, sister, brother, son-in-law, daughter-in-law, father-in-law, mother-in-law, step-parent, grandparent, grandchild, or father or mother of the employee's University-approved domestic partner, the employee may take up to 5 consecutive work days of bereavement leave immediately following the death, if requested.

B.    The supervisor will give consideration to requests for the use of accrued sick and/or vacation time in order to take additional time off beyond the bereavement leave allowed under University policies.

SECTION 18.2. VERIFICATION. The University has the right to request verification of relationship, death, attendance at funeral service and distance traveled before paying benefits under this Article. The University may request an Officer to complete a form stating the names and relationships of relatives covered by this Article.

## ARTICLE 19    LEAVES OF ABSENCE

SECTION 19.1. PERSONAL LEAVE OF ABSENCE.

   1.    Officers covered by this Agreement have the right to apply for a leave of absence in accordance with the University's Personnel Policy Guidelines governing personal leaves of absences, Section U508.
   2.    The University will provide Family Medical Leave (FMLA leave) as required by law.

SECTION 19.2. MILITARY RESERVE TRAINING. A full-time Police Officer who is called for annual military training, by either the United States Armed Forces Reserve or the National Guard, while on the University's active payroll, will be paid the difference between their regular rate of pay and the compensation they receive from the Government for one period of up to fourteen (14) consecutive days per contract year. The Officer must provide the University, at least thirty (30) days in advance, a copy of their orders. Failure to give notice will forfeit a Police Officer's right to this paid military leave. After completion of the leave, the Police Officer must turn over to the University all military pay they received excluding expenses. They will then receive regular straight-time pay for their scheduled work hours lost during the period of active duty training.  An Officer who has completed a year of service may opt to take vacation time for the military leave period and then retain both their vacation pay and their military pay.

SECTION  19.3 MILITARY LEAVE. Officers, who are required to enter military service of the United States or who voluntarily enlist in the United States Armed Services shall, within ninety (90) days from the date of discharge from service, be entitled to resume their employment with the University. Their seniority status will be retained, and they will be placed in a position commensurate with their seniority, if it is possible. Such Officers will be granted all rights and privileges as set forth by the Uniformed Services Employment and Reemployment Rights Act (USERRA), as long as

they comply with the requirements of the Act and of the University.

## ARTICLE 20   SICK LEAVE WITH PAY

SECTION 20.1   GENERAL. Benefits-eligible Officers begin accruing sick leave as of their most recent date of hire. Such Officers will be entitled to use accrued sick leave for their own illness after completion of three (3) months of service.

SECTION 20.2. ANNUAL SICK LEAVE ACCRUALS.

A.    Full-time Officers accrue paid sick time at the rate of eighty-four (84) hours per year.

B.    Sick leave will be credited monthly at the rate of one-twelfth (1/12) of the total annual hours of sick leave due the Officer for each completed month of employment. No sick leave accrues for any month during which the Officer is absent for more than one-half (1/2) of their standard working hours except where the absence is due to paid vacation, paid holidays, paid funeral leave, jury duty, paid sick leave or Line of Duty Workers Compensation status.

SECTION 20.3.   SICK LEAVE USE WHILE RECEIVING WORKERS COMPENSATION.   As provided in §20.2B., while sick leave does not accrue during any absence brought about because of occupational injury or occupational illness, an Officer shall not have sick leave automatically deducted while Officer remains eligible for temporary disability benefits under the State of Illinois Worker's Compensation Act or the Occupational Disease Act. However, Officers receiving Workers Compensation, but not receiving "line of duty pay" in accordance with §21.2.B., may elect to use accrued sick leave to supplement the difference between Workers Compensation benefits and the Officer's regular salary.

SECTION 20.4. PAID SICK LEAVE USE.

A.    Officers may use their sick leave allowances for absences due to the Officer's own illness or injury, or for receiving medical care, treatment, diagnosis, or preventive medical care and for absences due to an illness, injury, or medical appointment of the Officer's child, spouse, sibling, parent, mother-in-law, father-in-law, grandchild, grandparent or stepparent. The right is reserved by the University to require an Officer who has been absent for more than three (3) consecutive workdays, or who is suspected of abuse of sick leave at any time, to provide certification that the use of sick leave was permissible under this section. Failure to submit documentation when requested may disqualify the Officer from sick leave allowance and may result in corrective action. Eligible Officers who have been granted time off under the Family and Medical Leave Act (FMLA) can use sick leave allowances to receive pay.

B.    Eligible Officers will have sick leave accruals deducted as used, on an hour-for-hour basis, in increments of at least thirty (30) minutes. When sick leave is used, it will be paid at the eligible Officer's regular base rate of pay. Forms of variable pay (e.g., shift differential) are not used when calculating sick leave pay.

C.    Hours compensated as sick leave will not count as hours worked in the computation of overtime.

SECTION 20.5. USE OF VACATION OR PERSONAL HOLIDAYS FOR ILLNESSES. Officers  who have exhausted sick leave but who are eligible to use accrued vacation or personal holidays, may substitute vacation time or personal holiday time for sick leave, provided they receive advance approval from their supervisor.

SECTION 20.6.   SICK LEAVE PAY OUT ON RETIREMENT.   Any Officer who qualifies by age and service for retirement under the Employee Retirement Income Plan and who elects to retire from the University or who has at least twenty (20) years of continuous active service (seniority) and who voluntarily retires from their employment will at that time become eligible for either a lump sum payment or health care benefits, provided the Officer has a balance of accrued sick leave hours as provided in §20.6.A., or §20.6.B. The Officer must select one of the two (2) alternatives and is not permitted to combine the options.

24

A.    Lump Sum Payment.

    1.    An eligible Officer will receive a lump-sum amount, determined by multiplying thirty percent (30%) of up to a maximum of twelve hundred (1200) hours of unused accrued sick leave at that time, by the Officer's basic straight-time hourly rate; such payment shall not exceed three hundred sixty (360) hours of pay.

    2.    This lump-sum amount will be paid as terminal compensation, in addition to hours worked and any unused personal holiday time and accrued vacation time as provided under this Agreement. In the event the Officer dies during active employment, the payout and the compensation listed in this Section shall be made to the Officer's designated beneficiary.

    3.    Officers who terminate their employment from the University for reasons other than retirement shall not receive any payout of unused sick leave accruals.

## ARTICLE 21    WELLNESS DAYS

The University recognizes that police officers engage in day-to-day functions that expose them to physical demands and mental strain not experienced in other roles across the University. In support of the work that officers perform, all full-time officers in active status will accrue two (2) wellness days on January 1 of each year to be used before December 31 of the same calendar year, effective January 1, 2024. Wellness days are to be used at the officers' discretion, consistent with department call-in procedures. Wellness days will not be used in the calculation of overtime and are not paid out upon separation from the University.

## ARTICLE 22    WORK INCURRED INJURY LEAVE

SECTION 22.1  GENERAL PROVISIONS.

A.    Absences resulting from work-related accidents or illnesses and compensated under the Workers' Compensation or Occupational Diseases Acts of the State of Illinois will not be involuntarily charged against the Officer's accrued sick leave.

B.    Officers in Workers' Compensation status are ineligible to accrue sick leave, vacation leave, personal holidays, or seniority, or to receive University holiday pay, with the sole exception of Officers in Line of Duty Workers Compensation status.

C.    An Officer shall notify their supervisor of a work-related accident and submit a written statement in compliance with the Police Department policy of the injury or illness as soon as possible after the incident occurs. The Officer shall also complete the University Forms required to process Workers Compensation Claims.

SECTION 22.2 PAYMENTS.

A.    Workers Compensation Payments. Payment is sixty-six and two-thirds percent (66 2/3 %) of the Officer's average weekly wage, or as established by the State of Illinois Workers' Compensation Commission, up to a maximum set by the Commission. Workers' Compensation payments begin on the fourth day of lost time, unless lost time is fourteen (14) days or more, at which time the first three (3) days will be compensated as Workers' Compensation retroactively. An Officer may choose to use accrued sick, vacation or personal holiday time to remain in pay status for the first three (3) days, or to supplement Workers' Compensation Payments.

B.    Line of Duty Pay.  Line of duty injury is defined in the following ways. First, it is an injury received as a result of a willful act of violence committed other than by the officer, and a relationship exists between the commission of such act and the officer's performance of his/her duties as a law enforcement officer. Second, line of duty injury is an injury received while the officer is attempting to prevent the commission of a criminal act by another or attempting to apprehend an individual the officer suspects has committed a crime. Third, line of

25

duty injury is an injury received while carrying out the officer's duty of investigating a call for service. Fourth, line of duty injury is an injury received due to the negligence of another while performing duties as a law enforcement officer. Finally, line of duty injury is an injury received while participating in department-approved trainings of a physical nature, including without limitation: (1) Firearms training; (2) Bicycle Training; (3) RAD; (4) Defensive Tactics; and (5) Active Shooter training.

When the Chief of Police or designee determines that an officer has suffered any injury in the line of duty, which causes them to be temporarily unable to perform their duties, the Officer will receive the difference between their weekly pay and the Worker's Compensation weekly indemnity they receive for up to a maximum of fifty-two (52) weeks. The department may compensate the Officer with 100% line of duty pay if the Officer is unable to perform their duties for less than four (4) days and have medical documentation, either on the date of injury or within three days following an injury, to substantiate that they are unable to return to work and perform their duties without restrictions. If a full-time Officer is otherwise injured while on duty (e.g., walking to their patrol car, coming and/or going to work, lunch, or a meeting while on the University's time, court appearances, training courses that are not physical in nature, etc.), they will not be eligible for line of duty pay.

C.     Medical and Rehabilitation Expenses. Related medical and rehabilitation expenses including medications, therapy, supportive devices, and doctors' appointments will be paid in accordance with the terms of the University of Chicago Workers' Compensation practices and procedures.

D.     Personal Accident Insurance.     Personal Accident Insurance (PAI), also known as Accidental Death & Dismemberment (AD&D) is an additional benefit to the group life insurance available through your employer. It pays a benefit to you or your beneficiary, separate from the life insurance benefit, if you are severely injured or die as the result of an incident that occurred in the line of duty pursuant to Article 22.2B. The benefit can be used however you or your beneficiary would like. Coverage on your spouse and children may also be available if they are eligible for life insurance. Refer to Appendix F for more information.

SECTION 22.3. RETURN TO WORK.     Prior to returning to work, an Officer shall provide a written release demonstrating their ability to return to work from their Physician.

Such release shall be based on the Officer's current job description and will be provided to the physician by the University. The written release must describe whether accommodation, if any, is required. The University may require an Officer to have a second medical examination of prior to their return from Workers Compensation leave, or applying for Short Term Disability, to be conducted by a health care provider selected by the University. The University will bear the cost if it requires a second examination.

A.     The University may fill the Officer's position after the Officer has been inactive for thirteen (13) weeks.

B.     In the event an Officer is able to return to work within eighteen (18) months after the start of their Disability and has provided notice of their ability to return in advance of the conclusion of the 18th months, the University will place the Officer in the first Police Officer position that the University designates as available for posting/filling after the Officer receives their release, provided the Officer can demonstrate that they are able to return to work without accommodation. The parties recognize that placement may occur after the conclusion of the eighteen (18) months. In the event two (2) Officers are released for return from Workers Compensation, the Officer who was injured in the Line of Duty shall be placed first.

SECTION 22.4. MODIFIED DUTY.

A.     Subject to operational considerations including budgetary constraints, the University may modify an Officer's duty assignments. Such modifications may be hourly, weekly, or monthly in duration, and are at the sole non-grievable discretion of the University.

B.    Each modified duty assignment is made on a case-by-case basis, and assignments shall not set a precedent for other circumstances.

C.    Ordinarily, temporarily modified duty assignments will not exceed a ninety (90) day duration. The Police Chief or their designee may grant an extension after consideration on a case-by-case basis.

D.    An Officer's refusal to accept a modified assignment may be construed as a refusal of work, after which the University may post their position.

E.    Officers in Workers' Compensation status on the date this Agreement is ratified (October 4, 2024), must provide the University with notice of their ability to return to work within twenty-four (24) months of the start of the Workers' Compensation disability for the terms of §22.3.B to apply.

## ARTICLE 23    DISABILITY

SECTION 23.1. GENERAL PROVISIONS.

A.    The University provides Short-Term Disability (STD) coverage for all benefits-eligible Officers who have completed their IEP, and who are unable to work due to a non-work related illness or injury. In addition, an Officer who remains unable to return to work after the STD expires may apply for Long Term Disability.

B.    The University provides the same Short Term Disability benefits for Officers as it does for other non-exempt employees of the University. In the event the University changes these benefits, the University will give Officers and the Union notice of changes in the benefits.

C.    Officers in Short-Term and Long-Term Disability status are ineligible to accrue sick leave, vacation leave, personal holidays, or seniority, or to receive University holiday pay.

SECTION 23.2. SHORT TERM DISABILITY PROVISIONS.

A.    Any eligible Officer who is absent from work because of a medically substantiated non-work-connected accident or illness will be entitled to benefit payments beginning the fifteenth (15th) day of such absence or after the Officer exhausts their accrued sick leave, whichever is longer, through the thirteenth week of disability. In other words, the Officer is eligible for a total of eleven (11) weeks of STD pay for a total absence of not more than thirteen (13) weeks.

B.    The Short-Term Disability benefit payment will be sixty percent (60%) of basic straight-time hourly earnings.

C.    In the event an Officer is unable to return to work after a Short-Term Disability expires, they may apply for Long Term Disability or for a Leave of Absence.

D.    Prior to returning to work, an Officer shall provide a written release to return to work from their Physician. Such release shall be based on the Officers job description, and must describe whether accommodation, if any, is required. The University may require any Officer to have a second medical examination prior to their return from Workers Compensation leave, or applying for STD, to be conducted by a health care provider selected by the University. The University will bear the cost of such examination.

E.    The University will hold the Officer's position for a period of up to thirteen (13) consecutive weeks, while they are on STD. After the thirteenth (13th) week, the University may fill the Officer's position.

F.    In the event an Officer is released to return to work within twelve (12) months after the start of their Disability, the University will place the Officer in the first available position designated as available for posting/filling after the Officer receives their release, provided the Officer can demonstrate that they meet all hiring requirements for the position. In the event two (2) Officers are released for return from Disability and/or Workers

27

Compensation, the Officer who was injured in the Line of Duty shall be placed first.

## ARTICLE 24   RETIREMENT PLAN

SECTION 24.1. GENERAL. The University may change the retirement plan at any time so long as the changes are the same as for other non-exempt employees of the University who participate in the plan. The plan documents will govern all retirement plan benefits, procedures and administration. Any dispute concerning the University's retirement plan must be processed according to the dispute resolution procedure set forth in the University's retirement plan and will not be subject to the grievance/arbitration procedure of this Agreement.

SECTION 24.2. RETIREMENT PLAN PARTICIPATION. Enrollment in the University's Retirement Income Plan for Employees (ERIP) is mandatory for Officers who are twenty-one (21) years old or older, and who work at least 1,000 hours annually. Officers earn benefits under ERIP beginning on their one-year anniversary of employment.

ERIP is a 403(b) defined contribution plan that provides benefits through retirement savings accounts. Under ERIP, Officers establish an account into which both the Officer and the University contribute a percentage of their pay each pay period. The University contributes 4% of an Officer's compensation and Officers contribute a mandatory 3% by payroll deduction. Officers have the option to voluntarily contribute up to an additional 2% which will be matched up to 4% by the University. Refer to Appendix E for the ERIP Summary Plan Description.

## ARTICLE 25   GROUP HEALTH INSURANCE

Full-time Officers will continue to participate in the University-sponsored group health plans as they have in the past. All insurance benefits, procedures and administration will be governed by the plan documents of the respective plans. The University will have the right to amend, change or discontinue its plans or add new plans at any time so long as the amendments, changes, discontinuances or new plans apply equally to all other non-exempt Officers of the University who participate in the respective plans. Any dispute over any of the group health plans will be processed only pursuant to the dispute resolution procedure of the respective plans and will not be subject to the grievance/arbitration procedure of this Agreement.

## ARTICLE 26   RIGHTS OF OFFICERS UNDER INVESTIGATION / PROVIDNG WITNESS TESTIMONIES

SECTION 26.1. DISCIPLINARY INVESTIGATIONS

Whenever an officer covered by this Agreement is the subject of a Disciplinary Investigation as a result of a Complaint Register (CR) (other than Summary Discipline), the following procedure will be used:

A.   Other than in the initial stage of the investigation, all attempts will be made to have the questioning occur while the Officer is on duty in a private setting at the worksite. Such investigation shall be of reasonable length and will give consideration to the personal needs of the Officer being questioned, including reasonable periodic breaks.

B.   At the time the Officer is originally notified they are subject to a complaint or discipline investigation, they shall be informed of the nature of the complaint, including the alleged misconduct, the date, time, location, and the names of all complainants, when available, prior to the onset of the investigatory meeting. Anyone filing a complaint against an officer must have the complaint supported by either a written or electronic statement.

C.   The Officer under investigation shall be informed of the identity of the person assigned to conduct the investigation and of any other relevant individuals who will/may be present during the investigation. All individuals asking questions of the Officer under investigation will be made known to the Officer in advance.

D.   No anonymous complaint made against an Officer shall be the subject of a Complaint Register (CR) investigation unless the allegation is a violation of the Illinois Criminal Code, a criminal violation of a federal statute, or there is sufficient evidence (in addition to the complainant's written or electronic statement) to support the allegation.

E.  If management, based on the allegation under investigation, deems it prudent to suspend the Officer prior to the investigatory meeting, the officer will be given the appropriate disciplinary notice documents and will remain suspended until the outcome of the investigation has been determined. Under no circumstance will the suspended Officer be kept away from duty once it has been determined there is no basis for the complaint.

F.  The Officer under investigation will be provided, within three (3) administrative workdays, a copy of any statement they made during the investigatory interview. At such time, the Officer under investigation will have an opportunity to review their statement(s) and will be responsible for providing their signature to said document.

G.  An Officer under investigation may opt to exercise their Weingarten rights by requesting union representation to be present during the investigatory interview. If requested by the Officer under investigation, reasonable efforts will be made to schedule the investigatory interview at a time when the union representative can be present. If it is not feasible for the union representative to be present, the Officer may request that a union representative be present for further discussion before the matter is considered concluded.

SECTION 26.2. WITNESS OFFICER'S STATEMENTS IN DISCIPLINARY INVESTIGATIONS When an Officer covered by this Agreement is required to give a written statement or oral statement in the investigatory process as a witness (other than Summary Punishment), at the request of the Witness Officer the interview shall be conducted in the following manner:

A.  Other than in the initial stage of the investigation, all attempts will be made to have the questioning occur while the officer is on duty in a private setting at the worksite.

B.  The Officer providing witness testimony shall be informed of the identity of the person assigned to conduct the investigation and of any other relevant individuals who will/may be present during the investigation. All individuals asking questions of the Witness Officer will be made known to the Witness Officer in advance.

C.  The Witness Officer will, within three (3) administrative workdays of the time the statement or response was made, be provided with a copy of any statement or response document. At such time, the Witness Officer will have the opportunity to review the document and will be responsible for providing their signature to said document.

D.  This Article shall not apply to questions from a supervisor in the course of performing their normal day-to- day supervisory duties or to requests to prepare detailed reports or To-From-Subject Reports.

SECTION 26.3. DISCLOSURE.  Should the investigatory meeting reveal personal information unique to the Officer or their family, the parties agree that the disclosure of such personal information shall not be made available for public inspection or copying.

SECTION 26.4. OBLIGATION OF ALL OFFICERS.  Officers are reminded that they can be disciplined, even separated from the University for refusing to answer questions, narrowly directed, relating to their official actions or obligations which were assumed upon appointment to their respective Officer positions.

## ARTICLE 27   MISCELLANEOUS

SECTION 27.1. OTHER AGREEMENTS.  The University shall not enter into any agreement or contract with its Police Officers, individually or collectively, which in any way conflicts with the terms and provisions of this Agreement. Any such agreement will be null and void.

SECTION 27.2. IDENTIFICATION CARDS.  The University will provide laminated official Police Department identification cards to each Police Officer. The University will provide a laminated Police Department Retirement Identification Card to retiring Police Officers who retire with at least twenty (20) years of active University employment, as well as any items provided per department policy.

SECTION 27.3. UNIFORMS.  The University will supply one set of uniforms to each Police Officer in accordance with

the uniform requirements of the University's Police Department. Officers are required to maintain and clean their uniforms. Thereafter, Officers may purchase uniforms and duty-related equipment from a vendor(s) designated by the University, effective July 2024. The University will reimburse the vendor only for those items on a list provided by the University, up to a maximum reimbursement of $1000.00 per year. Officers who are in the assignment of Investigator may use their uniform allowance to purchase plain dress clothes. Investigators will be required to submit itemized receipts for reimbursement.

SECTION 27.4. OFFICER RESPONSIBILITY TO PROVIDE ACCURATE INFORMATION. Each Officer will furnish the University with a telephone number where they may be reached or where messages for them may be left, their current address and their current dependency status. An Officer's failure to furnish this information and to keep it current pursuant to the University's policies, relieves the University from all liability under this Agreement where the information is required for notice, benefit coverage, etc.

SECTION 27.5. FULL-TIME POLICE OFFICER HIRING FROM PART-TIME POLICE OFFICER STATUS. If a part-time Police Officer covered by this Agreement wishes to be hired as a full-time Police Officer, they must apply to the University within thirty (30) days of their release from their employment with another police department. If a full-time vacancy exists, the part-time Officer may apply. During the hiring process, the applicant will have to take the physical agility test and the Oral Boards in order to be hired as a full-time Police Officer. If the part-time Officer is accepted for full- time employment they must begin employment when directed by the University and their full-time Officer hire date will ultimately be their seniority date.

SECTION 27.6. TUITION REIMBURSEMENT PROGRAM. Full-time Police Officers may continue to participate in the University's tuition reimbursement program. The University may amend or otherwise change the program at its discretion, so long as the amendments or changes apply equally to all employees who participate in the program.

## ARTICLE 28 LABOR-MANAGEMENT CONFERENCES

SECTION 28.1. GENERAL. The Union and the University agree that in the interest of efficient management and harmonious employee relations, meetings should be held between representatives of the Officers and the University. These meetings will be referred to as "Labor-Management" conferences.

SECTION 28.2. AGENDA. Problems of mutual concern, including conditions tending to cause misunderstanding, will be considered and recommendations made to either the University or the Union, or both, by the persons present at any Conference. These conferences will be separate from the grievance procedure provided for in Article 12. Grievances will not be considered at labor-management conferences, nor will either party make proposals to alter the terms of this Agreement.

SECTION 28.3. PRE-MEETING PREPARATION. At least ten (10) days prior to each labor-management conference, the University and the Union will exchange information as to the proposed subject matter to be discussed at the forthcoming meeting and the names of those attending.

SECTION 28.4. SCHEDULING OF CONFERENCES. The parties will agree on the times, dates and places of labor-management conferences.

SECTION 28.5. MINUTES. A representative of the University will keep minutes of each labor-management conference and distribute copies of the minutes to Committee members.

## ARTICLE 29 BULLETIN BOARDS

The University will provide an adequate bulletin board to permit the Union to post notices of its meetings, social events, election notices and results and agreements between the University and the Union. The Union will send a copy of each notice to the Chief of Police or their designee and to the Assistant Vice President, Human Resources, or their designee before posting on the bulletin board.

## ARTICLE 30    DRUG AND ALCOHOL POLICY

SECTION 30.1. GENERAL.    The University's health and future depend on safe, healthful and efficient working conditions. Alcohol and drugs pose serious potential health, safety and security risks. Additionally, in certain circumstances, their use is unlawful. In an effort to protect the University's personnel, assets and operations and to maintain safe and efficient operations, the policy outlined below will apply to all Officers.

SECTION 30.2. USE OF DRUGS AND ALCOHOL.    Officers shall not possess or use any controlled substance defined under the Illinois Controlled Substance Act at any time, whether on or off duty, unless prescribed by a physician. In addition, Officers shall not report to work under the influence of any substance that impairs their ability to perform the full functions of their position.

A.    PRESCRIPTION DRUGS.    When drugs are prescribed, Officers are required to ask the prescribing physician or other authorized health practitioner whether the drug will impair them in the performance of their duties. If the prescription will cause impairment, the Officer must follow the departmental directives regarding sick leave. Officers taking prescribed medications may be required to provide documentation, acceptable to the University, certifying that they can continue to perform their jobs safely.

B.    NON-PRESCRIPTION DRUGS.    Any Officer using legal, over-the-counter non-prescription drugs, who feels in any way impaired shall advise their supervisor of such impairment without delay and, whenever possible, prior to reporting for duty. The Department may require that the Officer use accrued sick leave due to the impairment.

C.    TESTING.    The University retains the right to require drug/alcohol testing a whenever it suspects an Officer has reported to work under the influence of drugs or alcohol.

Officers who are determined to be under the influence while at work may be discharged. In addition, the University reserves the right to randomly test Officers for drug use.

SECTION 30.3. PRE-EMPLOYMENT SCREENING. All applicants for employment may be required to submit to testing for evidence of illegal/abusive drug and/or alcohol use. If an applicant tests positive, refuses to be tested, or tampers or attempts to tamper with the testing process, the applicant will not be hired. Applicants who present a valid pre-dated prescription for substance(s) for which they test positive or other satisfactory evidence of a legitimate medical explanation will be considered on a case-by-case basis.

SECTION 30.4. PROHIBITION. Officers who buy, sell, use or possess alcohol or illegal drugs while working (the period from starting time to quitting time), while operating the University's vehicles, while on the University's premises or while carrying out the University's instructions will be discharged. In addition, Officers are prohibited from reporting to work, or working under the influence of alcohol or drugs, as defined here.

SECTION 30.5. DEFINITIONS.

A.    "Under the influence" of alcohol or drugs means, any impairment that would affect an officer's ability to perform the regular duties of their job.

B.    The term "drugs" includes any and all controlled substances, such as, but not limited to, marijuana, cocaine, hallucinogens, amphetamines, barbiturates, phencyclidine (PCP), depressants, opiates, methadone, methaqualone, benzodiazepines, as well as so called "designer" drugs with similar effects. The term "drugs" also includes prescription and over-the-counter medications which are being intentionally abused, as well as inhalants such as glue and nitrous oxide.

C.    Federally–established levels will be used when screening urine specimens in the initial test to determine whether they are positive or negative for the category of drugs or classes of drugs. The following represent those levels at the time of negotiation, however, if the federal-established levels change, the University will utilize the new federally-established levels.

| INITIAL TEST ANALYTE | INITIAL TEST CUTOFF CONCENTRATION (NG/ML) | COMFIRMATORY TEST ANALYTE | CONFIRMATORY TEST CUTOFF CONCENTRATION (NG/ML) |
|---|---|---|---|
| Marijuana Metabolites | 50 | THCA | 15 |
| Cocaine Metabolites | 150 | Benzoylecgoine | 100 |
| Opiate Metabolites* (Codeine/Morphine) | 2000 | Codeine | 2000 |
| 6-Acetylmorphine | 10 | 6-Acetylmorphine | 10 |
| Phencyclidine (PCP) | 25 | Phencyclidine (PCP) | 25 |
| Amphetamines AMP/MAMP | 500 | Amphetamines Methamphetamine | 250 250 |
| MDMA | 500 | MDMA MDA MDEA | 250 250 250 |

SECTION 30.6 SELECTION OF OFFICERS FOR DRUG AND/OR ALCOHOL TESTING.

A.  Officers will be required to provide breath, hair, urine or blood specimens for evidence of drug or alcohol use whenever:

   1.  they are suspected by a supervisor of reporting to work or working under the influence of drugs or alcohol or of using drugs or alcohol while working;

   2.  they are involved in a reportable accident in which medical assistance is provided to the Officer or otherwise involved in the accident;

   3.  they are given a physical examination;

   4.  they have been rehired or have been continued in employment, as outlined in Section 27.8 below;

   5.  they are under consideration for a promotion; or

   6.  they are selected for a random test; or

   7.  Officer Involved shootings.

B.  Officers selected for testing will immediately go for the test at the collection and testing facility selected by the University.

SECTION 30.7 TEST PROCEDURES. Specimens will be collected at a facility designated by the University, under circumstances designed to prevent sample switching and tampering. Blood, hair and/or urine specimens will be sealed and labeled in the presence of the tested Officer and sent to a licensed testing laboratory designated by the University for testing. The University will notify the Union in advance of collection and testing facilities to be used. Detailed records will be kept to prevent misidentification of samples and to preserve and protect the chain of possession integrity.

A.  All positive urine screens will be confirmed through GC/MS testing (Gas Chromatograph/Mass Spectrometry) before any discipline is imposed or hiring decisions are made. Positive test thresholds have been set high enough so that persons who have not actually ingested drugs themselves should not test positive.

B.  Breath, hair and/or blood specimens will be tested using appropriate methodologies.

C.  An Officer who tests positive for drugs has the right, at their own expense, to have the specimen tested (using GC/MS techniques) by an independent licensed testing laboratory chosen by the Officer. Testing and chain of custody procedures must be similar to those of the initial testing laboratory.

D.  Officers selected for post-accident or reasonable cause testing will be suspended pending the receipt of test results. Officers whose test results are negative will be paid for all lost time.

SECTION 30.8  VOLUNTARY TREATMENT AND COUNSELING.

A.  An Officer who requests treatment or a leave of absence for treatment will not be disciplined for making the request. An Officer may not, however, escape discipline by first requesting treatment or a leave after being selected for testing or violating the University's policies and rules. Requests for treatment will be kept confidential in accordance with federal and state law.

B.  Any Officer who feels he or she may have a substance abuse problem is urged to contact one of the Police Department's Chiefs or designee. An Officer who does this will not be disciplined or retaliated against.

The University is interested in a safe workplace, healthy and productive workforce, not in punishing Officers who come for help. The Officer must begin and complete satisfactorily an approved treatment program and the ongoing requirements of the program and consent in writing to the disclosure by the program of its recommendations, any dangers it perceives in connection with the Officer's continued performance of their job and whether the Officers is complying with and has successfully completed the program and the ongoing requirements of the program. The Officer will also submit to further testing as required by the University.

SECTION 30.9. CONFIDENTIALITY AND PRIVACY.

A.  The University will attempt to ensure that all aspects of the testing process are as private and confidential as reasonably practicable. Actual test results will be provided to supervisors and managers who have a need to know the information and to the person tested.  Except as required by law, test results will not be disclosed to co-workers or to the Officer's family or uninvolved supervisors without the specific permission of the person tested.

B.  The University will, however, inform the police of the unlawful use, possession or delivery of drugs by Officers and will turn over any drugs confiscated to the police.

SECTION 30.10.  CONSEQUENCES OF TESTING POSITIVE, REFUSING TO BE TESTED, DELAY IN BEING TESTED OR TAMPERING WITH TESTS.

A.  Officers who provide valid pre-dated prescriptions or other legitimate medical explanation for their test results will not be disciplined, unless abuse is shown, but they may be required to authorize disclosure of underlying medical conditions to the University's designated doctor. Furthermore, they may be placed on a leave of absence if, in the judgment of management, a safety hazard exists.

B.  Officers who refuse to cooperate in testing, delay being tested or otherwise tamper with the testing process will be discharged. Officers who test positive for drugs or alcohol will be discharged.

## ARTICLE 31   SEPARABILITY AND SAVINGS

If any Article or Section of this Agreement should be held invalid by operation of law or by any tribunal of competent jurisdiction, or if compliance with or enforcement of any Article or Section should be restrained by such a tribunal pending a final determination as to its validity, the remainder of this Agreement will in no event be affected. In the event that any Article or Section is specifically declared invalid by a tribunal of competent jurisdiction, then, on request

by either the University or the Union, the parties will enter into immediate collective bargaining negotiations for the purpose of arriving at a mutually satisfactory replacement for the invalidated Article or Section. In no event will the operation of any other Article or Section be affected during these negotiations.

## ARTICLE 32   NONDISCRIMINATION

The University and the Union agree that both will abide by applicable federal, state, and municipal laws and statutes prohibiting discrimination against any employee on the basis of age, race, color, ancestry, national origin, sex sexual orientation, gender identity, marital status, pregnancy, religion, political affiliation, disability, military veteran status, Union membership or lack thereof, and/or activity on behalf of either the Union or the University. The parties acknowledge their commitment to maintaining a work environment free from unlawful discrimination and harassment.

## ARTICLE 33   DURATION

SECTION 33.1. TERM OF THE AGREEMENT. This Agreement shall be effective from May 1, 2023 and shall terminate on 12:00 midnight on April 30, 2027, and shall renew itself from year to year after that, unless written notice of termination or modification is given by either party, by certified mail or by personal delivery, to the other, on or before sixty (60) days prior to April 30, 2027, or the same date of any later year.

SECTION 33.2. TERM OF AGREEMENT DURING NEGOTIATIONS.   In the event the expiration date of this Agreement, or the expiration date of any later yearly period, is reached and a new Agreement has not been agreed on, this Agreement will be temporarily extended until either a new Agreement is agreed on or either of the parties serves a ten (10) day notice on the other that the negotiations have terminated. After the serving of this written notice, there will be no strike or lockout during the following period of ten (10) days, and the parties will meet within this period in order to give both parties an opportunity to reconsider their decision and attempt to arrive at a new Agreement.

**SIGNATURE PAGE**

The Parties hereto have caused this Agreement to be executed by their duly authorized representatives, to be effective May 1, 2023.

**The University of Chicago**  **PBPA Local 185**

Brett Leibsker, VP, HR    Date 10/15/24

Victor Vazquez, Chief Spokesperson    Date 10/14/2024

Deven Swanigan, Chief Negotiator    Date 10/16/24

Charles Crowley, Attorney    Date 10/14/24

Kyle Bowman, Chief of Police    Date 10-16-24

Joseph Augustyn    Date 10/12/24

Eric Heath, AVP, DSS    Date 15 Oct 24

Alexander Donner    Date

Diane Ziarno, Executive Director, DSS    Date

Date 14 Oct 24

Janelle Marcellis, Deputy Chief    Date 15 Oct 24

**APPENDIX A WAGES – MINIMUM RATES**

|  | Effective First Full Pay Period July 2023 | Effective First Full Pay Period July 2024 | Effective First Full Pay Period July 2025 | Effective First Full Pay Period in July 2026 |
|---|---|---|---|---|
| PO II - Non Certified | $ 37.31 | $ 38.24 | $ 39.20 | $ 40.18 |
| PO III - Certified | $ 40.62 | $ 41.64 | $ 42.68 | $ 43.74 |
| Step 2 | $ 43.68 | $ 44.77 | $ 45.89 | $ 47.03 |
| Step 3 | $ 45.82 | $ 46.96 | $ 48.14 | $ 49.34 |
| Step 4 | $ 47.97 | $ 49.17 | $ 50.40 | $ 51.66 |
| Step 5 | $ 50.23 | $ 51.48 | $ 52.77 | $ 54.09 |
| Step 6 | $ 51.30 | $ 52.58 | $ 53.90 | $ 55.25 |
| Step 7 | $ 52.38 | $ 53.69 | $ 55.03 | $ 56.40 |
| Step 15+ | $ 54.09 | $ 55.44 | $ 56.83 | $ 58.25 |

Officers hired between July and December prior to July 1, 2023 will advance to the next step in July 1 of each year. Officers hired after July 1, 2023 will be placed on the step commensurate with their years of service at that time.

**APPENDIX B**   **REIMBURSEMENT AGREEMENT FOR HIRING AND TRAINING EXPENSES**

Candidate Name: _____

Job Title: _____

Date: _____

INTRODUCTION

It is recognized that the University will incur substantial costs as direct or indirect results of hiring individuals as police officers. The University provides training requisite to become a certified Illinois State Peace Officer and training to maintain certification as prescribed by the Illinois Law Enforcement Officers' Training & Standards Board. These costs may include police academy tuition, training, uniforms, equipment and/or other related items.

The purpose of this agreement is to provide for reimbursement to the University if a newly hired police officer leaves employment with the University for any reason within thirty-six (36) months after the completion of the training at the Chicago Police Department's Education and Training Division Basic Metropolitan Recruit Program (or another police academy) or within thirty-six (36) months after the employment start date for already certified police officers.

REIMBURSEMENT OBLIGATION

I,_____, understand and agree that, in consideration of my employment with The University of Chicago Police Department (UCPD), I will reimburse the UCPD for all costs and expenses related to my training, uniforms, equipment and/or other related items required to become a police officer subject to the following terms and conditions:

1. I agree to serve as a police officer with the UCPD for a period of not less than thirty-six (36) months after the completion of my initial training at the Chicago Police Department's Education and Training Division Basic Metropolitan Recruit Program (or another police academy) or within thirty-six (36) months after the employment start date for already certified police officers.

2. I agree that if I resign or terminate employment with the UCPD for any reason during my initial evaluation period of 18 months for non-certified police officers or initial evaluation period of 12 months for certified police officers, I will repay 100% of the training, uniform, and equipment costs and/or additional expenses by the UCPD.

3. I agree that if I resign or terminate employment with the UCPD for any reason after my initial evaluation period but prior to serving thirty-six (36) months after completion of the police academy or employment start date if already a certified police officer, I will reimburse the UCPD on a one-thirty-sixth (1/36) per month(s) remaining pro rata share for all costs and expenses related to training, uniforms, equipment and/or other related items.

4. I understand and agree that I will be responsible for reimbursing the UCPD for the actual costs and expenses incurred on my behalf. Listed below are <u>estimated</u> costs of academy tuition, training, uniforms, and equipment:

| | |
|---|---|
| Training: Academy Tuition effective July 1, 2012 | $3,000 |
| Uniforms | $3,759* |
| Equipment | $450* |
| Total | $7,259 * |

*(See Appendix C for a more specific itemized list of uniforms and equipment estimated costs.)

5. I understand and agree that this agreement does not constitute an employment contract and that the UCPD reserves the right, as employer, to reassign, discipline or to terminate in accordance with applicable University policies, collective bargaining agreements, and/or laws and regulations. I also understand that this agreement does not grant me any special rights or benefits from the UCPD and does not require the UCPD to offer me a position as a police officer. I understand that this agreement does not alter or affect any other terms or conditions of my employment with the UCPD.

6. I agree that the UCPD, in its sole discretion, may retain and deduct from my last payroll check, any amount due and payable to the UCPD, to the extent allowed by law, to offset against any training and other employment related expenses (per section 4 above) that I would be obligated to reimburse the UCPD. I agree to repay any outstanding expenses for which I may be responsible to the UCPD within 30 days of my resignation or termination of employment. I agree to complete the form in Appendix D at the time the pay check deduction is made.

7. I agree that if it becomes necessary to enforce this contract and judgment is entered against me, I will pay all costs and expenses incurred by the UCPD including attorney fees.


_____          _____
Print Candidate Name                      Date


_____
Candidate Signature

38

## Appendix C - Uniform Items for Reimbursement List

| Item | Quantity | Unit Cost* | Total | Return Items |
|---|---|---|---|---|
| Pants, Cargo | 2 | $ 92.00 | $ 184.00 | |
| Pants, Non-Cargo | 1 | $ 77.25 | $ 77.25 | |
| Shirt, L/S, Navy | 3 | $ 73.25 | $ 219.75 | |
| Shirt, S/S, Navy | 3 | $ 67.00 | $ 201.00 | |
| Belt | 1 | $ 25.00 | $ 25.00 | |
| Duty Belt | 1 | $ 59.50 | $ 59.50 | |
| Safety Vest, Police | 1 | $ 42.75 | $ 42.75 | |
| Rainjacket | 1 | $ 149.75 | $ 149.75 | |
| Fur Trooper Cap | 1 | $ 26.95 | $ 26.95 | |
| Sweater | 1 | $ 97.00 | $ 97.00 | |
| Dress Blouse, F/C | 1 | $ 239.95 | $ 239.95 | Yes |
| Dress Pants, F/C | 1 | $ 88.50 | $ 88.50 | |
| 3 Season Jacket | 1 | $ 349.00 | $ 349.00 | |
| Dress Cap | 1 | $ 44.25 | $ 44.25 | |
| Dress Shoes | 1 | $ 62.00 | $ 62.00 | |
| Incl. panels, concealable carrier and shock plates) | 1 | $ 849.90 | $ 849.90 | Yes |
| Custom outer vest carrier - Four pocket standard | 1 | $ 137.00 | $ 137.00 | |
| Tie, Clip On, Black | 1 | $ 5.50 | $ 5.50 | |
| Tie Bar, Silver | 1 | $ 4.95 | $ 4.95 | |
| Nameplate, Polished Silver | 2 | $ 7.95 | $ 15.90 | Yes |
| OC Holder | 1 | $ 20.50 | $ 20.50 | Yes |
| Double Mag Holder | 1 | $ 31.00 | $ 31.00 | Yes |
| Handcuffs | 1 | $ 26.00 | $ 26.00 | Yes |
| Handcuff Case | 1 | $ 26.80 | $ 26.80 | Yes |
| Key Ring | 1 | $ 7.95 | $ 7.95 | Yes |
| Belt Keeper | 4 | $ 3.30 | $ 13.20 | Yes |
| Glove Pouch | 1 | $ 12.75 | $ 12.75 | |
| ASP Baton, 21" | 1 | $ 105.00 | $ 105.00 | Yes |
| ASP Scabbard | 1 | $ 42.00 | $ 42.00 | |
| ASP Triad F/L | 1 | $ 132.00 | $ 132.00 | |
| Knit Hat, Blauer, w/Star Embroidery | 1 | $ 30.95 | $ 30.95 | |
| Baseball Cap, FlexFit, w/Star Embroidery | 1 | $ 17.00 | $ 17.00 | |
| | | | | |
| | | | | |
| **Subtotal** | | | **$ 3,345.05** | |
| | | | | |
| | | | | |
| | | | | |
| **Item** | **Quantity** | **Unit Cost**** | **Extended** | |

| | | | | |
|---|---|---|---|---|
| BDU Pants | 2 | $ 52.95 | $ 105.90 | |
| BDU Shirt | 2 | $ 52.95 | $ 105.90 | |
| Baseball Cap | 1 | $ 5.95 | $ 5.95 | |
| Sweatshirt with name and left chest logo | 2 | $ 18.50 | $ 37.00 | |
| T-Shirt with name and left chest logo | 2 | $ 10.50 | $ 21.00 | |
| Short | 1 | $ 16.95 | $ 16.95 | |
| Sweatpants | 1 | $ 14.95 | $ 14.95 | |
| Nameplate, Academy | 2 | $ 9.95 | $ 19.90 | |
| Inert OC | 1 | $ 9.90 | $ 9.90 | |
| Mouthguard w/Case | 1 | $ 7.50 | $ 7.50 | |
| Redman Helmet | 1 | $ 38.46 | $ 38.46 | |
| Range Glasses | 1 | $ 12.95 | $ 12.95 | |
| Hearing Protection | 1 | $ 13.95 | $ 13.95 | |
| Safety Goggles | 1 | $ 3.75 | $ 3.75 | |
| | | | | |
| | | | | |
| | | | | |
| Subtotal | | | $ 414.06 | |
| | | | | |
| TOTAL | | | $ 3,759.11 | |

*All Prices are subjected to change based on Vendor List Prices

Note: All UCPD patches must be returned designated items

40

**APPENDIX D**       **PAYCHECK DEDUCTION AGREEMENT**

Instructions: This form is to be completed at the time the paycheck deduction is made.

I,_____, authorize The University of Chicago to deduct from my wages and/or my final

compensation the amount of $_____per the Reimbursement Agreement for Hiring and

Training Expenses I completed prior to my employment at The University of Chicago.


_____          _____

Print Employee Name                               Date


_____

Employee Signature

41

**APPENDIX E RETIREMENT INCOME PLAN FOR EMPLOYEES (ERIP) SUMMARY PLAN DOCUMENT**

http://humanresources.uchicago.edu/benefits/retirefinancial/retireplans/ERIP3_PostJuly1_FINAL.pdf

APPENDIX F - PERSONAL ACCIDENT INSURANCE (AD&D)

https://intranet.uchicago.edu/benefits-and-career/benefits/benefit-plan-documents

## LETTER OF UNDERSTANDING - WELLNESS INCENTIVE

In an effort to aid Officers in maintaining an appropriate level of physical fitness and a healthy lifestyle, the University will offer a lump sum payment of $550.00, less applicable payroll deductions, payable in the first full pay period in November of each calendar year, to Officers who participate and complete the Illinois Law Enforcement Training and Standards Board Peace Officer Wellness Evaluation Report ("POWER") test. Officers who complete the test, which is normally given between January 1st and October 1st, will be required to submit proof of completion no later than October 15th of each calendar year.

Officer participation in the POWER test is voluntary and participation will occur during an Officer's off-duty hours and without compensation.  No Officer will suffer any adverse action or retaliation due to their test results or for choosing not to participate in the test.

_____          _____
Deven Swanigan          Date          Charles Crowley          Date

44

Letter of Understanding – PO5

The University will no longer recognize the permanent PO5 classification and any associated pay rates as referenced in any documentation. The University will provide a one-time lump sum stipend in the amount of $3,500, less applicable taxes and withholding, to the following individuals who are in a full-time active status:

Victor Vazquez

Cecil Cook

Louis Royland

This payment shall be due in full at the time retro payment checks are issued to officers.

| | | | |
|---|---|---|---|
| Deven Swanigan | Date | Charles Crowley | Date |

# INDEX

## A

| | |
|---|---|
| ACCESS TO UNIVERSITY EQUIPMENT | 11 |
| ANNUAL SICK LEAVE ACCRUALS | 23 |
| ANNUAL SQUADRON WORK SCHEDULES | 14 |
| APPENDIX F – EXTENSION AGREEMENT | 43 |
| APPENDIX G – LONGEVITY INCREASES | 44 |
| AUTHORIZED UNIVERSITY HOLIDAYS | 19 |

## B

| | |
|---|---|
| BEREAVEMENT LEAVE | 22 |
| BONUS | 19 |
| BULLETIN BOARDS | 30 |

## C

| | |
|---|---|
| CALL BACK PAY | 16 |
| CARRY OVER OF VACATION | 21 |
| CHECK-OFF AND FAIR SHARE | 9 |
| COMPENSATION FOR HOLIDAYS | 19 |
| CONSEQUENCES OF TESTING POSITIVE, REFUSING TO BE TESTED, DELAY IN BEING TESTED OR TAMPERING WITH TESTS | 33 |

## D

| | |
|---|---|
| DISABILITY | 26 |
| DISCIPLINARY GRIEVANCES | 18 |
| DISCIPLINARY INVESTIGATIONS | 27 |
| DRUG AND ALCOHOL POLICY | 30 |
| DURATION | 34 |

## E

| | |
|---|---|
| EFFECTUATING REDUCTION IN FORCE | 13 |
| ELIGIBILITY REQUIREMENTS | 20 |
| ENUMERATION | 9 |

## F

| | |
|---|---|
| FULL-TIME POLICE OFFICER HIRING FROM PART-TIME POLICE OFFICER STATUS | 29 |

## G

| | |
|---|---|
| GENERAL INCREASES | 18 |
| GRIEVANCE DEFINED | 16 |
| GRIEVANCE DISCUSSIONS | 16 |
| GRIEVANCE PROCEDURE | 16, 17 |
| GRIEVANCE REQUIREMENTS | 16 |
| GRIEVANCE SUBMISSIONS | 16 |
| GROUP HEALTH INSURANCE | 27 |

## H

| | |
|---|---|
| HOLIDAYS | 19 |
| HOLIDAYS DURING VACATION | 20 |
| HOLIDAYS NOT WORKED | 19 |
| HOLIDAYS WORKED | 20 |
| HOURS OF WORK | 14 |

## I

| | |
|---|---|
| IDENTIFICATION CARDS | 29 |
| INDEMNIFICATION | 9 |
| INDIVIDUAL OFFICER WORK ASSIGNMENTS | 15 |
| INITIAL EVALUATION PERIOD | 13 |
| ITEMIZED LIST OF UNIFORMS AND EQUIPMENT WITH ESTIMATED COSTS | 39 |

## J

| | |
|---|---|
| JOB CLASSIFICATION SCHEDULE AND MINIMUM RATES OF PAY | 18 |

## L

| | |
|---|---|
| LABOR-MANAGEMENT CONFERENCES | 29 |
| LAYOFF | 13 |
| LEAVES OF ABSENCE | 23 |
| LINE OF DUTY PAY | 25 |
| LONGEVITY INCREASE | 18 |

## M

| | |
|---|---|
| MANAGEMENT'S RIGHTS | 9 |
| MEDICAL AND REHABILITATION EXPENSES | 25 |
| MILITARY LEAVE | 23 |
| MILITARY RESERVE TRAINING | 23 |
| MISCELLANEOUS | 29 |
| MODIFIED DUTY | 26 |
| MUTUAL ASSIGNMENT CHANGES | 15 |

## N

| | |
|---|---|
| NEW JOB CLASSIFICATION(S) | 13, 19 |
| NO EXTENSION OF VACATION | 22 |
| NO STRIKE – NO LOCKOUT | 10 |
| NONDISCRIMINATION | 33 |
| NON-PRESCRIPTION DRUGS | 30 |

## O

| | |
|---|---|
| OFFICER RESPONSIBILITY TO PROVIDE ACCURATE INFORMATION | 29 |
| OFFICERS WHO TERMINATE WITHIN THIRTY SIX MONTHS | 13 |
| OTHER AGREEMENTS | 29 |
| OVERTIME DEFINITION AND PAYMENTS | 15 |
| OVERTIME SCHEDULING | 15 |

## P

| | |
|---|---|
| P2 POLICE OFFICERS (NON-CERTIFIED) | 12 |
| PAID SICK LEAVE USE | 24 |
| PAY CHECK DEDUCTION AGREEMENT | 41 |
| PAY PERIOD | 19 |

PAYMENT FOR COURT TIME                                              16
PERMANENT PO5 OFFICERS                                             46
PERSONAL HOLIDAYS                                                  20
PERSONAL LEAVE OF ABSENCE                                          23
POLICE OFFICER CLASSIFICATIONS                                     12
POLICE OFFICER RESPONSIBILITY                                      15
POSTING OF SCHEDULES AND INDIVIDUAL OFFICER ASSIGNMENTS
                                                                   14
PRE-EMPLOYMENT SCREENING                                           31
PRESCRIPTION DRUGS                                                 30
PROHIBITION                                                        31

### R

REIMBURSEMENT AGREEMENT FOR HIRING AND TRAINING
    EXPENSES                                                       37
RELEASE TIME FOR BARGAINING                                        11
RESCHEDULING/CANCELING VACATION                                    22
RETIREMENT PLAN                                                    27
RETIREMENT PLAN PARTICIPATION                                      27
RETURN TO WORK                                                     25
RIGHTS OF OFFICERS UNDER INVESTIGATION / PROVIDNG
    WITNESS TESTIMONIES                                            27

### S

SELECTION OF OFFICERS FOR DRUG AND/OR ALCOHOL TESTING 32
SENIORITY                                                         11
SEPARABILITY AND SAVINGS                                          33

SHIFT DIFFERENTIAL                                                19
SHORT TERM DISABILITY PROVISIONS                                  26
SICK LEAVE PAY OUT ON RETIREMENT                                  24
SICK LEAVE USE WHILE RECEIVING WORKERS COMPENSATION    24
SICK LEAVE WITH PAY                                               23
SIGNATURE PAGE                                                    35
SQUADRON ASSIGNMENTS                                              14
STEWARDS COMMITTEE                                                10
SUBCONTRACTING                                                    10

### T

TERM OF AGREEMENT DURING NEGOTIATIONS                 34
TERM OF THE AGREEMENT                                             34
TERMINATION OF SENIORITY                                         12
TEST PROCEDURES                                                   32
TESTING                                                           30
TUITION REIMBURSEMENT PROGRAM                          29

### U

UNIFORMS                                                          29
UNION ACTIVITY                                                    11

UNION REPRESENTATION                                             10
UNION REPRESENTATIVE VISITATION                        11
UNION SECURITY                                                     8
USE OF DRUGS AND ALCOHOL                                30
USE OF VACATION OR PERSONAL HOLIDAYS FOR ILLNESSES     24

### V

VACATION                                                          21
VACATION ACCRUALS                                                21
VACATION ELIGIBILITY                                             21
VACATION ON TERMINATION                                22
VACATION PAY                                                      22
VACATION SCHEDULING                                              21
VOLUNTARY TREATMENT AND COUNSELING                    32

### W

WAGE RATE PROGRESSION                                            18
WAGES                                                             18
WAGES – MINIMUM RATES                                            36
WELLNESS INCENTIVE                                                45
WORK INCURRED INJURY LEAVE                             25
WORK PERIOD / SCHEDULE, AND WORK DAY                  14
WORKERS COMPENSATION PAYMENTS                          25
WORKWEEK                                                          14



THE UNIVERSITY OF
**CHICAGO**

**Department of Safety and Security**
850 E. 61st Street
Chicago, IL 60637

April 11, 2024

Mustapha Jallow
810 W Grace Street, 1201
Chicago, IL 60613

Dear Mustapha,

This letter is to confirm our conversation today, April 11, 2024, during which I informed you of the termination of your employment effective immediately due to an internal investigation that alleged excessive use of force towards a university visitor on November 20, 2022. The investigation determined that you failed to comply with the department's use of force policy, were untruthful regarding your use of force, and that you were in violation of the following UCPD policies:

1. Use of Force General Order (108) section 108.3 A, which states: It is the policy, and a guiding principle, of the Department to value and preserve human life. Employees will afford all, the respect and dignity to which all people are entitled. The use of excessive or unwarranted force or unprofessional conduct.

2. Use of Force General Order (108) section 108.3 D, which states Officers shall use de-escalation techniques whenever appropriate and practicable, to attempt to avoid the use of force, or minimize the level of force.

3. Use of Force General Order (108) section 108.7 A 4, which states The Tactical Response Report (UCPD-44.179) will be used to document the following incidents: All forms of physical force, applied by an employee, beyond that normally used to effect an arrest.

4. Code of Conduct General Order (1003) section 1003.5 B1, which states: Sworn personnel will devote themselves to attaining Department goals (Section 3). They will conduct themselves in such a manner as will reflect credit upon the Department, with emphasis on integrity and professionalism. They will: Render the highest order of police service to all persons.

5. Code of Conduct General Order (1003) section 1003.5 B1, which states: Sworn personnel will devote themselves to attaining Department goals (Section 3). They will conduct themselves in such a manner as will reflect credit upon the Department, with emphasis on integrity and professionalism. They will: Render the highest order of police service to all persons.

6. Code of Ethics General Order (1002) section 1002.4 A, which states: In support of the ethics listed in the preceding paragraphs, employees of the University of Chicago Police Department must conform to the following principles: A. They will tell the truth, the whole truth, and nothing but the truth. Any resort to half-truths or evasions will result in


EXHIBIT
C

**THE UNIVERSITY OF CHICAGO**

**Department of Safety and Security**
850 E. 61st Street
Chicago, IL 60637

irreparable damage to their reputation and destroy public and official confidence in the entire department.

Below are the details surrounding the termination:

1. Your last day of work and termination date is today, April 11, 2024. You will receive your pro-rated biweekly salary through today's date. Any accrued but unused vacation leave, in accordance with University policy, will be included in your final paycheck.

2. You must return all University property, including your University ID card, immediately.

3. Your health, dental and vision care insurance (if currently enrolled) will end on April 30, 2024, but you will have the option of continuing insurance under COBRA for 18 months. If you elect COBRA, your status is COBRA beneficiary rather than current employee. Because of this, if you are Medicare-eligible, you must take steps to ensure coordination of benefits between Medicare and the health care coverage you have as a COBRA beneficiary. COBRA is administered by WEX Health, Inc. If you have not received a package of COBRA materials from WEX Health, Inc. within 15 days of the expiration of your benefits (April 30, 2024) please call University Benefits at 773-702-9634. Your life insurance, long-term disability, and personal accident insurance (if currently enrolled) will end on April 11, 2024. For information on options to convert your life insurance, personal accident insurance and long-term disability please call University Benefits at 773-702-9634.

4. In accordance with University policy, you are not eligible for rehire at the University of Chicago.

5. Should any prospective employer seek verification of your University employment, Human Resources will verify only your dates of employment, title, and final salary.

If you have any other questions, please contact Shontay Grant-Pinder, HR Business Partner at shontayg@uchicago.edu.

Sincerely,

Janelle Marcellis
Deputy Chief, Patrol Services
University of Chicago

cc:     Employee and Labor Relations
        HR- Operations

**Organization:**

The University of Chicago

**Grievance Type:**

Step 1 met w/
X _____ Step 2
_____ Step 3

# GRIEVANCE REPORT

## Unit #185

**Policemen's Benevolent & Protective Association**

**Date Submitted:**

12 APR 2024

**Received By UCPD:**

_____
Date

Date 12 APR 2024

Grievant's Name **Mustapha Jallow**

Grievant's Job Title **Police Officer/PIII**

Seniority Date **21 JUN 2021**

Supervisor **Lt. Shannon**

**Article(s) in Violation:**

Union Representative **Victor Vazquez**

**Article 4 Section 4.1 Enumeration**

Statement of Grievance: ( include all pertinent information) **Listed grievant, was terminated on April 11, 2024.**

**This discipline is in violation of Article 4 Section 4.1 Enumeration which states "management has the right to promote, demote, and transfer, to suspend, discipline and discharge for cause". Discipline was issued without just cause. Discipline was not corrective or progressive, but overly severe.**

Statement Desired: **The union is requesting all reports, audio, video, and any other records that that pertain to this investigation. Additionally, the grievant is requesting to be immediately reinstated as a full time police officer and be made whole of any lost wages due to his termination.**

_M. Jallow_ 12 APR 2024
**Grievant's Signature** Date

_Victor Vaz_ 12 APR 2024
**Union Representative's Signature** Date

**University's Answer:** _____

**Grievant's Signature** _____ **Date** _____

**Union Representative's Signature** _____ **Date**

**Settlement Agreed to:** _____

**University's Representative** _____ **Date**

**Title** _____

**Union's Representative** _____

**Title** _____

**EXHIBIT**

**D**